478 So.2d 1033 (1985)
In re Mattie BROWN a/k/a Delores Brown.
Misc. No. 1954.
Supreme Court of Mississippi.
October 30, 1985.
*1035 Barry W. Gilmer, Samuel B. Magruder, Jr., Gilmer & Jones, Jackson, for appellant.
Cynthia L. Hewes, Michael C. Wallace, Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and ROBERTSON and ANDERSON, JJ.
ROBERTSON, Justice, for the Court:

I.
Man has long sought to live according to his religious beliefs and to be let alone in the process. So living we yearn to be free of societal opprobrium and state interference. The lesson of history is that, because we are diverse, the existence of the former will lead to the latter, in consequence of which we have for all time vested each person with a legal shield adequate of design to thwart state impingement.
This case is about the State's effort to keep alive until trial a wounded witness to two violent felonies. It is also about the efforts of that witness, who by religious faith is a Jehovah's Witness, to accommodate the State only if that may be done consistent with her sincere conviction that to accept into her body the blood of another permanently separates her from her God and subjects her to eternal damnation. Because those who founded our nation believed in the primacy of individual rights in such highly personal matters, and thus placed permanently within our law rules securing to one and all the rights to the free exercise of religion and to privacy, we hold for Jehovah's Witness and against the State.

II.
On August 25, 1985, Mattie Brown, age 47, was shot and seriously wounded. Brown, a resident of Edwards, Mississippi, was immediately taken to the Hinds General Hospital in Jackson. Her condition required prompt surgery and the physician in charge recommended blood transfusions to support Brown during the surgery. Brown indicated that she wanted to live; that she wanted the necessary surgery; only, that she refused the transfusions. Brown recites biblical verses said to proscribe receiving the blood of others.
Immediately after the shooting, Hinds County law enforcement authorities took into custody Brown's daughter, twenty year old Andrea Ruby Brown, and charged her with aggravated assault upon her mother. Andrea is also charged in the rat poison murder of her father, Andrew Lee Brown.
Believing that Mattie Brown was the only person who was in a position to provide the State with eyewitness testimony in the two prosecutions against Andrea Ruby Brown, the Hinds County District Attorney's swung into action. That office applied to the Chancery Court of Hinds County, Mississippi for an order requiring that, incident to the needed surgery, Brown receive blood transfusions despite her religious beliefs. The District Attorney's purpose was to avoid the risk that a critical witness would die before trial. Proceeding ex parte on August 26, 1985, the Chancery Court entered the order as requested. On August 29, 1985, Brown appeared through counsel and moved to vacate the order, *1036 asserting her religious beliefs and her rights to the free exercise thereof and to privacy. The Chancery Court overruled and denied the motion to vacate.
The contemplated surgery took place and Mattie Brown did receive blood transfusions. Notwithstanding, Brown insisted that the issue was not moot and brought an emergency appeal to this Court. The matter received further urgency when on September 11, 1985, this Court was advised that Brown would require additional surgery in connection with which her surgeon had again recommended blood transfusions, to which, as before, Brown objects.
After receiving briefs of counsel for Mattie Brown and the State regarding the matter, this Court heard oral argument on September 12, 1985. That afternoon the Court announced that the orders of the Chancery Court of August 26 and 29 would be vacated and directed that Mattie Brown not be required to submit to or receive a transfusion of blood against her will, notwithstanding any interest the State of Mississippi may claim in the matter. We further announced that this opinion would issue in due course articulating the basis and contours of that decision.
The posture of the matter on September 12, 1985, was this: Mattie Brown, age 47, was an alert and competent adult. She was not pregnant and, insofar as the record reflects, she had no dependent children. Her attending physician was of the opinion that she was in need of prompt surgery. Brown insisted that she wanted this surgery. Notwithstanding that she had received one court ordered whole blood transfusion, Brown objected to another. Brown's attending physician was of the opinion that her chances for recovery from the surgery without the availability of blood were "fair". Obviously, the chances of recovery would have been markedly increased with blood available.[1] Knowing these things, Brown made a determination that she would claim her rights to the free exercise of religion and to privacy and asked this Court to prohibit any further transfusions. Our Order of September 12, 1985, granted this relief.

III.
Before considering the merits a point need be observed. We are presented Mattie Brown's claim of two rights  a right to the free exercise of her religious beliefs and a right of privacy. If those rights be held to include the right, as a competent adult, to refuse a blood transfusion, the matter is at an end, unless the State can point to some competing right vested in it by some valid rule which is a part of our positive law. Rights are subject to compromise only when they collide with conflicting rights vested in others.
To be sure, a right may be entailed. The freedom afforded Mattie Brown to exercise her religion and otherwise be let alone, though fundamental, is not without limits. Those limits, however, must be found within the right and the rule creating it. Once the right has been defined and shaped by the contours of the rule  the First, Ninth and Fourteenth Amendments to the U.S. Constitution and Article 3, Sections 18 and 32 of the Mississippi Constitution of 1890  it prevails against mere interests, public or private, no matter how compelling.
By definition rights give the individual zones of unchecked discretionary action that others, whether private citizens or governmental authorities, may not invade. They are entitlements of an individual he or she may claim at his or her election. They may be claimed no matter how inconvenient society or its members may deem it. See Pearson v. State, 428 So.2d 1361, 1364 (Miss. 1983). That they may be so claimed is what defines them as rights. Read v. State, 430 So.2d 832, 840 (Miss. 1983). They are, if you will, the individual's protection against the tyranny of the majority and against the power of the state. They *1037 are what gives meaning to that article of American faith: that each human being is unique, that by virtue of his humanity he possesses an unalienable and undeniable dignity and worth that he is entitled to the maximum basic personal liberty consistent with like liberty for each other.
We give these theories reality when we enforce secured rights at times that society finds it most inconvenient, when compelling reasons are presented why in the absence of the right the individual and her (to others) puny claim ought be shunted aside. Few such occasions arise, perhaps because it is known in this state that we do not sacrifice rights to mere interests. See Read v. State, 430 So.2d at 840; Brooks v. State, 209 Miss. 150, 155, 46 So.2d 94, 97 (1950); Fisher v. State, 145 Miss. 116, 134, 110 So. 361, 365 (1926).

IV.
Claimed here are two rights said to have been vested in each person within this state: the right of free exercise of one's religious beliefs and the right to privacy. We will consider first Brown's claim that her right of free exercise of her religious beliefs includes the right to refuse a blood transfusion.
The First Amendment to the Constitution of the United States prohibits the federal sovereign's interference with the free exercise of religion. That prohibition has been extended to the State of Mississippi. See Wallace v. Jaffree, ___ U.S. ___, ___, 105 S.Ct. 2479, 2487, 86 L.Ed.2d 29, 39 (1985); Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).
The Mississippi Constitution of 1890, in Article 3, § 18, provides that
the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred; provided only that the rights hereby secured shall not be construed to justify acts ... dangerous to the peace and safety of the state... .
The right of free exercise of religion protects more than mere beliefs, more even than speech or public profession.[2] Religiously grounded actions or conduct are often beyond the authority of the state to control. Wisconsin v. Yoder, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15, 27-28 (1972); Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 970 (1963); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1942). Where the religiously grounded "action" is a refusal to act rather than affirmative, overt conduct, the State's authority to interfere is virtually non-existent except only in the instance of the grave and immediate public danger. Refusal of state mandated vaccination necessitated to prevent widespread danger to the public health is not within the right to free exercise. Prince v. Massachusetts, 321 U.S. 158, 166-67, 64 S.Ct. 438, 88 L.Ed. 645 (1944)[3]; Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1904); Brown v. State, 378 So.2d 218, 223 (Miss. 1979). On the other hand, interests of such magnitude as a state's "interest in universal compulsory formal secondary education to age 16" are without the right and have been held insufficient to generate entailments of one's right to the free exercise of religion. Wisconsin v. Yoder, 406 U.S. at 219, 92 S.Ct. at 1535.
This is not the first time Jehovah's Witnesses have been confronted with state-sponsored insensitivity to their practice of the articles of their faith. Due in no small part to their pestersome practices, the Jehovah's Witnesses have clogged the dockets of this nation's courts for half a century. See cases as far back as Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 *1038 L.Ed. 949 (1938); Schneider v. Town of Irvington, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Notwithstanding a significant fumble at the beginning, see Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, (1940),[4] the judiciary of this land generally has responded responsibly, to its eternal credit. In the midst of the nationalistic fervor of World War II, the Supreme Court recognized the right of Jehovah's Witnesses not to be compelled to salute our nation's flag, as they regarded it a graven image, worship of which is prohibited. West Virginia State Board of Education v. Barnette, 319 U.S. at 642, 63 S.Ct. at 1187. More than a generation later the Court thwarted on free exercise grounds Indiana's efforts to deny unemployment compensation to a Jehovah's Witness who, by reason of his religious beliefs, voluntarily quit his job with a military contractor. Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).
Brown claims a right to reject a blood transfusion on grounds that such would contravene the basic teachings of the Jehovah's Witnesses. The transfusion would, we are told, interfere with her free exercise of her religious faith.
Jehovah's Witnesses make no objection to receiving medical care, including surgery. If we understand correctly their views, they take full advantage of modern medical technology, with the single exception of blood transfusions. They believe and accept as authoritative and binding upon them the admonition of Almighty God Jehovah found in the Holy Bible commanding Christians to "abstain from blood." The foundation for this belief lies in a quotation from Acts of the Apostles, chapter 15, vs. 20:
Hence my decision is not to trouble those from the nations who are turning to God, but to write to them to abstain from things polluted by idols and from fornication and from what is strangled and from blood."
See also Acts 15:28-29. From the Old Testament Jehovah's Witnesses cite from Leviticus, 17th chapter, vs. 10:
As for any man of the house of Israel or some alien resident who is residing as an alien in your midst, who eats any sort of blood, I shall certainly set my face against the soul that is eating the blood, and I shall indeed cut him off from amongst his people.
Jehovah's Witnesses as a congregation insist that such exercise of their religious beliefs does no harm to society and that, in spite of the risks they run, rarely do they in fact lose their lives solely because of refusal of blood transfusions. No matter how ill-advised it may appear to others, this anti-blood injunction is accepted by Jehovah's Witnesses everywhere. Brown subscribes to this belief and comes before this Court asserting a deeply felt religiously grounded right to live her life consistent with her and her congregation's reading of the scriptures.
Without precedent in this state, the point has arisen not infrequently elsewhere. Other courts have recognized that a competent and intelligent adult Jehovah's Witness may of right refuse a blood transfusion, notwithstanding any interest of the *1039 state or anyone else to the contrary. See, e.g., Mercy Hospital, Inc. v. Jackson, 62 Md. App. 409, 489 A.2d 1130, 1132-33 (1984); St. Mary's Hospital v. Ramsey, 465 So.2d 666, 668 (Fla.App. 1985); In re Osborne, 294 A.2d 372, 375 (D.C.App. 1972); In re Brooks' Estate, 32 Ill.2d 361, 205 N.E.2d 435, 442-43 (1965).
Application of President and Directors of Georgetown College, Inc., 118 U.S.App. D.C. 80, 87, 331 F.2d 1000, 1007 (D.C. Cir.1964), cert. denied, 377 U.S. 978, 84 S.Ct. 1833, 12 L.Ed.2d 746 (1964), cited by the State is distinguishable because the patient there was without capacity to make an intelligent judgment at the time. The cases we have found arguably to the contrary, United States v. George, 239 F. Supp. 752 (D.Conn. 1965), and John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 279 A.2d 670 (1971), are, in a word, wrong.
In sum, there is a valid rule in our law that prohibits state interference with most instances of the free exercise of religion, particularly actions or conduct negative in nature. That rule is of constitutional dimensions  state[5] and federal. The right emanating therefrom includes a right to exercise one's religious beliefs by adhering to the Jehovah's Witnesses view that the scriptures preclude receiving the blood of others. That right is entailed only by compelling considerations of public safety and danger. Mattie Brown derives rights from that rule which she here claims. Because that which she claims is within the right, and no showing of great and imminent public danger has been shown[6], the matter ends, for in this state we take seriously the right to the free exercise of religion.

V.
Each individual enjoys a right of privacy. Each of us has a right to the inviolability and integrity of our persons, a freedom to choose or a right of bodily self-determination, if you will. The right was labeled by Samuel B. Warren and the then young Louis D. Brandeis as "the right to be let alone". Warren and Brandeis, The Right To Privacy, 4 Harv.L.Rev. 193, 195 (1890). Brandeis later referred to it as:
the most comprehensive of rights and the right most valued by civilized man.
Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (dissenting opinion).
Contemporaneous with the famous Warren and Brandeis formulation, the Supreme Court in Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), wrote that:
No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.
141 U.S. at 251, 11 S.Ct. at 1001.
This right of inviolability of one's person has been subsumed in the federal domain by a broader right of privacy held of constitutional stature. Carey v. Population Services International, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); City of Akron v. Akron Center For Reproductive Health, Inc., 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542, 549 (1969). This right of privacy includes "independence in making certain kinds of important decisions". Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 51 L.Ed.2d 64, 73 (1977). Among these are decisions regarding whether and what foreign substances will be injected into one's body.
A right to privacy has been recognized as a part of the common law of this state. Deaton v. Delta Democrat Publishing *1040 Company, 326 So.2d 471, 473 (Miss. 1976). This right of privacy, whether perceived as emanating from the common law or natural law, is given constitutional status by Article 3, § 32 of the Mississippi Constitution of 1890.
Another manifestation of this right is found in the doctrine of informed consent recognized in the area of law and medicine. No physician or hospital may subject one to medical treatment without that person's informed consent. Reikes v. Martin, 471 So.2d 385, 392 (Miss. 1985); Ross v. Hodges, 234 So.2d 905, 908 (Miss. 1970). See Miss. Code Ann. §§ 41-41-3, et seq. (Supp. 1984). Violation of this rule constitutes a battery. See Scott v. Bradford, 606 P.2d 554, 557 (Okla. 1979); Chambers v. Nottebaum, 96 So.2d 716, 718-19 (Fla.App. 1957); Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 14-15 (1905).
The informed consent rule rests upon the bedrock of this state's respect for the individual's right to be free of unwanted bodily intrusions no matter how well intentioned. Informed consent further suggest a corollary: the patient must be informed of the nature, means and likely consequences of the proposed treatment so that he may "knowingly" determine what he should do  one of his options being rejection. That we would hesitate hardly a moment before holding liable a physician or hospital which proceeded without the patient's informed consent says much regarding the patient's broad right to refuse treatment.
The existence in our law of this fundamental right to be let alone has been further recognized by our legislature's enactment that mentally competent adults may of right require withdrawal of life-sustaining medical support mechanisms. Miss. Code Ann. §§ 41-41-101, et seq. (Supp. 1984). From this rule, it follows on principle that one such as Mattie Brown may decline the life-sustaining support that a blood transfusion would offer.
Though in fact her religious beliefs are the reason for her rejection decision, Brown also claims her right of privacy. This right has no necessary connection with any organized religion nor any personal religious beliefs. It is secured to each person within the constitution  saint or sinner, Christian or Jew, agnostic or athiest. It may be claimed for motives noble or base.
In the context of the facts of this case, Mattie Brown's right to be let alone confers upon her the right to refuse a blood transfusion because she simply does not want one, a right again entailed only in cases of great and imminent public danger.[7] Today many fear blood transfusions as a source of infection with other dread diseases. Though these fears likely are ill-founded, the State has no authority to interfere with one's acting upon such a fear absent evidence of imminent public danger. The point, however, is that the right to privacy is so personal that its protection does not require the giving of a reason for its exercise. That one is a person, unique and individual, is enough.

VI.
The State nevertheless argues that it has interests substantial enough to overcome Mattie Brown's rights. Keeping in mind
that only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion,
Yoder, 406 U.S. at 215, 92 S.Ct. at 1533, 32 L.Ed.2d at 25, we turn to the State's claims.
Fundamentally, the State asserts the primacy of the prosecution of Andrea Ruby Brown for the murder of Andrew Lee Brown and aggravated assault upon Mattie Brown. Without doubt these prosecutions should take place. The State, however, says this gives rise to a compelling state interest sufficient to override Mattie Brown's rights to the free exercise and *1041 practice of her religious beliefs and her right to privacy.
Put another way, the State suggests that allowing Mattie Brown to enjoy her free exercise and privacy rights will likely result in a guilty murderer going free  whereupon, the State says, she will be free to kill and kill again. The predictions implicit in this argument are highly problematic. Moreover, the danger to society of one murderer escaping prosecution are qualitatively different  and lesser  than that of a small pox epidemic. See Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1904); Brown v. Stone, 378 So.2d 218, 223 (Miss. 1979). However, legitimate and important the State's interest may be in having available for testimony at trial an eyewitness, that interest is not within those compelling so as to entail Mattie Brown's rights to free exercise of her religious beliefs and to privacy. The State has called to our attention no case where its reasoning has been accepted on comparable facts.
The rights with which we are here concerned are personal rights peculiar to the individual. They do not survive the individual's death. They may not be invoked by anyone other than the individual in whom they are vested, Harley v. Oliver, 404 F. Supp. 450, 456 (W.D.Ark. 1975), aff'd. 539 F.2d 1143 (1976); Jehovah's Witnesses In State Of Washington v. King Country Hospital No. 1, 278 F. Supp. 488, 504 (N.D. Wash. 1967), aff'd. 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968), reh'g. denied 391 U.S. 961, 88 S.Ct. 1844, 20 L.Ed.2d 874 (1968), and then only when that individual is a competent and alert adult. The Maryland case, cited by the State, Snyder v. Holy Cross Hospital, 30 Md. App. 317, 352 A.2d 334 (1976), is wholly inapposite in that the State's intrusion was in the form of an autopsy.
The State also advances a waiver theory. Conceding that Mattie Brown had the right, upon being shot, to remain in her home and take her chances upon recovery without blood transfusions, we are told that she has waived this right by seeking treatment. The facts reflect that after the shooting Mattie Brown called the Sheriff's office and asked for help. By doing this and accepting treatment at Hinds General, Mattie Brown, the State argues, waived any right to object to the course and conduct of such treatment. The argument is specious. An individual has the right to seek treatment from a physician, surgeon or a hospital and specify such conditions as he or she may desire  local anesthetic as distinguished from general anesthetic, conservative as opposed to surgery, medication or no medication, and, of course, blood transfusions or no blood transfusions. The physician, surgeon and hospital, when presented with such conditions, obviously have the right to decline treatment if in their opinion the conditions are unreasonable or otherwise unacceptable. We are advised here, however, that both the hospital, Hinds General Hospital, and the surgeon are agreeable to providing Mattie Brown with the medical care and treatment she needs subject to the condition she wishes to impose: no blood transfusions. Mattie Brown did not waive her right to insist on such a condition by seeking treatment or by any other conduct of hers which has been brought to our attention.
The State also insists that Mattie Brown is not competent to make a life threatening decision to refuse blood transfusions.[8] The State argues that, since the shooting on August 25, Brown has been in various states of mind about the matter and has shown such confusion that we should hold that she is without capacity to invoke her religion and privacy rights. The circumstances suggest that the State is mistaken. While we have not talked with Brown personally, her counsel earnestly represents that she is in full possession of *1042 her faculties at this time and that he is acting and speaking solely in her behalf. Suffice it to say that the factual information available to us makes clear that Brown's position has been consistent throughout: that she wants to live, that she wants the benefits of all that medical science can do for her with the sole and only exception that she rejects any treatment proscribed by the tenets of her religious faith.
We emphasize that what has been said above applies solely to competent and alert adults. St. Mary's Hospital v. Ramsey, 465 So.2d at 667; In re Brooks' Estate, 205 N.E.2d at 442; Bartling v. Superior Court, 163 Cal. App.3d 186, 209 Cal. Rptr. 220, 224 (1984); Tune v. Walter Reed Army Medical Hospital, 602 F. Supp. 1452, 1456 (D.C. 1985); Erickson v. Dilgard, 44 Misc.2d 27, 252 N.Y.S.2d 705, 706 (1962). We are not certain whether the State here relies upon a statutory procedure available in this state whereby a person may be given medical care and treatment including surgery without otherwise necessary consent, Miss. Code Ann. § 41-41-9 (1972). Such reliance would be misplaced as this procedure is available solely in the case of "minors or adults of unsound mind" which would render it wholly inapplicable to the case at bar.
For these reasons it is ordered:
(a) That the Order of the Chancery Court of Hinds County, Mississippi, entered August 26, 1985, and August 29, 1985, shall be, and the same hereby are, vacated and held for naught; and
(b) that Petitioner Mattie Brown shall not be required to submit to or receive a transfusion of blood against her will, notwithstanding any interest the State of Mississippi may claim in the matter.
REVERSED AND RENDERED
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS, J., dissents.
HAWKINS, Justice, dissenting:
I respectfully dissent.
In a sense the opinion in this case is moot. A panel of this Court heard the matter and issued its order on September 12, 1985.
I fully adhere to a person's Constitutional right to refuse a blood transfusion on the ground of religious conviction, even though the refusal is life threatening.
When, however, that person is a vital witness to a serious crime, the State's right to see that she receives adequate medical treatment to assure her attendance and testimony at trial may very well override her personal religious conviction. She then has no more right to refuse adequate medical treatment than she would have the right to refuse to testify as a witness. The State's right to compel her testimony carries with it the right to take proper medical safeguards to see that she is able to testify. If the proposed treatment was in any way doubtful or questionable, we might have another matter. For the purposes set forth in the majority opinion, such is not the case here.
I realize there is the matter of degree, and a weighing of all the factors to determine whether the right of the State in each case overrides a Constitutional right of the individual. In my view, the State's right to have Brown in court as a healthy witness should prevail.
In deference, except for the implications the majority may choose to impute from them, I do not believe any of the authorities cited are contrary to the view I have of the matter.
NOTES
[1] We have been advised informally that the surgery has in fact been performed on Mattie Brown, without blood transfusions, and that the patient not only survived but is convalescing nicely.
[2] The exercise of religious beliefs has been regarded as a form of expression protected by the free speech guarantee of the First Amendment. Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).
[3] Cases such as Prince may also rest on the principle explained below that the rights here at stake are personal rights exercisable only by competent adults. The persons to be vaccinated were children. See pages 18, 20-21, infra.
[4] The Gobitis experience is one we must not forget. Decided in 1940 Gobitis found no infringement of constitutional rights attendant upon a requirement that the children of Jehovah's Witnesses attending public schools participate in the ceremony of saluting the national flag. While the judicial restraint exercised in Gobitis was arguably admirable, the aftermath was deeply disturbing.

Children of this faith [Jehovah's Witnesses] have been expelled from school and are threatened with exclusion for no other cause. Officials threaten to send them to reformatories maintained for criminally inclined juveniles. Parents of such children have been prosecuted and are threatened with prosecutions for causing delinquency.
Barnette, 319 U.S. at 630, 63 S.Ct. at 1181, 87 L.Ed. at 1633.
It was against this backdrop that in 1943 the Supreme Court forthrightly overruled Gobitis in Barnette, 319 U.S. at 642, 63 S.Ct. at 1187, 87 L.Ed. at 1640, and cautioned that we never again experiment with compromises of such fundamental rights.
[5] Though we believe it compelled by a faithful application of First Amendment jurisprudence, our decision today is grounded independently in Miss. Const. art. 3, § 18 (1890).
[6] The reasons why we hold there are present here no compelling considerations of public dangers are discussed below.
[7] Though we find this right well within the federally recognized right of privacy, this portion of our decision today is grounded independently in Miss. Const. art. 3, § 32 (1890) and in the common law of this state.
[8] The State in effect conceded weakness in this point at oral argument when its acknowledged that, if in her present state of mind, Mattie Brown gave a confession to which any crime of which she may have been charged, that confession would have been sufficiently, knowingly, and intelligently given so as to be admissible in a court of law.