806 So.2d 278 (2001)
John M. MARCHBANKS, Administrator of the Estate of Mrs. Sarah Winston Dicks, Deceased, Appellant,
v.
Charles D. BORUM, M.D., Appellee.
No. 1999-CA-01982-COA.
Court of Appeals of Mississippi.
August 7, 2001.
Rehearing Denied October 2, 2001.
Certiorari Denied January 24, 2002.
*280 John E. Mulhearn, Jr., Natchez, John Dominic Redhead, Attorneys for Appellant.
Joseph L. McNamara, Jackson, Donna H. Wright, Attorneys for Appellee.
Before SOUTHWICK, P.J., IRVING, MYERS, and CHANDLER, JJ.
IRVING, J., For the Court:
¶ 1. This case involves Dr. Charles D. Borum's decision in ordering an injection of a tranquilizer given to his former patient, Sarah Dicks, and his involvement in her transfer to a local nursing home. After an extended hospital stay, Mrs. Dicks, who later died at her home of causes unrelated to Dr. Borum's treatment and care of her, was sent to Trace Haven Nursing Home for a period of recuperation. The administrator of Mrs. Dicks's estate filed a claim on behalf of the estate against Dr. Borum and others alleging that he wrongfully, and in violation of the law, committed Mrs. Dicks to the nursing home against her will. Other allegations included abuse of process and malicious prosecution as to Dr. Borum's involvement in conservatorship proceedings, false imprisonment, and *281 battery. The estate claimed damages for the economic loss, emotional distress and mental anguish of Mrs. Dicks prior to her death and for punitive damages. The jury found for Dr. Borum. Mrs. Dicks's estate appeals the jury's verdict asserting that the trial court made some twenty errors that either entitles the estate to a new trial or a judgment notwithstanding the verdict. We quote verbatim the statement of issues presented:
(1) Whether the trial court committed error in applying throughout the trial a "reasonable" standard to measure Dr. Borum's conduct.
(2) Whether the trial court committed error in its ruling that Dr. Borum's actions were exonerated if such actions were in the "totality of the circumstances" "objectively reasonable."
(3) Whether the trial court committed error in its ruling that in effect held that "objectively reasonable" conduct given the "totality of the circumstances" prevails over the important vested constitutional, statutory, and fundamental rights of a patient under In Re Mattie Brown, 478 So.2d 1033 (Miss.1985), Lee v. Alexander, 607 So.2d 30 (Miss.1992), Fox v. Smith, 594 So.2d 596 (Miss.1992), § 41-41-3 and § 41-41-9 of the Mississippi Code of 1972, Annotated, As Amended, and § 41-21-61 through XX-XX-XXX of the Mississippi Code of 1972, Annotated, As Amended.
(4) Whether the trial court committed error in treating Dr. Borum's violation of Mrs. Dicks important fundamental substantive rights, statutory rights, and constitutional rights as only a "technical" violation of the law.
(5) Whether the trial court committed error in not granting plaintiff's motion for directed verdict as to liability when plaintiff rested and in refusing to grant said motion when it was renewed at the conclusion of the case prior to submission of the case to the jury.
(6) Whether the trial court committed error in failing to give plaintiffs peremptory jury instruction P-1.
(7) Whether the trial court committed error in giving, over the objection of the plaintiff, jury instruction C 6 based upon the jury's consideration of whether Dr. Borum's acts were "objectively reasonable" under the "totality of the circumstances."
(8) Whether the trial court committed error by giving two separate forms of verdicts over the objection of the plaintiff, instructions C-3 and C-4, and refusing to give plaintiffs instruction P-15 providing for a general verdict.
(9) Whether the trial court committed error by giving, over the objection of the plaintiff, instruction D-12.
(10) Whether the trial court committed error in failing to give either instruction P-4 or P-4A offered by the plaintiff.
(11) Whether the trial court committed error in failing to give instruction P-4B offered by the plaintiff.
(12) Whether the trial court committed error in failing to give instruction P-6 offered by the plaintiff.
(13) Whether the trial court committed error in failing to give instruction P-6B offered by the plaintiff.
(14) Whether the trial court committed error in failing to give instruction P-6C offered by the plaintiff.
(15) Whether the trial court committed error in failing to give instruction P-6D offered by the plaintiff.

*282 (16) Whether the trial court committed error in failing to give instructions P-7, P-8, P-9, P-10, P-11 and P-12 relating to the standard of care and negligence.
(17) Whether the trial court committed error in failing to recognize the settled law that provides that the plaintiffs claim of gross negligence, which was specifically pleaded by the plaintiff, included simple negligence.
(18) Whether the trial court committed error in failing to grant Plaintiff's Third Motion in Limine, in failing to sustain plaintiff's written objection to certain deposition testimony of Elizabeth Power and in admitting said testimony over the objection of the plaintiff.
(19) Whether the trial court committed error in its ruling to not allow consideration of punitive damages and in directing a verdict on that issue.
(20) Whether the trial court committed error in failing to grant Plaintiffs Motion for a New Trial and Motion of the Plaintiff for Judgment Notwithstanding the Verdict.
We find no reversible trial court errors and affirm the jury's verdict.

FACTS
¶ 2. At eighty-one years old, Sarah Dicks lived alone. She had an on-again, off-again relationship with her only daughter who lived out of state. Mrs. Dicks spent many of her holidays with her niece, Elizabeth Power, and her family. Mrs. Power regularly checked in on Mrs. Dicks, spoke to her by phone frequently and accompanied her to some of her doctor visits. According to Mrs. Power, her family had "adopted" Mrs. Dicks.
¶ 3. On Christmas Day of 1994, Mrs. Power was expecting Mrs. Dicks to join them for Christmas dinner. However, Mrs. Dicks called that morning and explained to her niece that she was not feeling well and would not join the Powers as expected. Later in the day, Mrs. Power brought Mrs. Dicks dinner, and the next day, Mrs. Power visited Mrs. Dicks and found her severely ill. She contacted the local emergency service, and Mrs. Dicks was transported to Natchez Community Hospital by ambulance. Mrs. Power accompanied Mrs. Dicks to the hospital and provided information to the hospital necessary for Mrs. Dicks's admission to the emergency room. Mrs. Dicks's physician at that time was Dr. Charles Borum. After consulting with a surgeon, it was determined that Mrs. Dicks needed gall bladder surgery. Mrs. Power, who had previously met Dr. Borum on prior visits with Mrs. Dicks, was consulted about Mrs. Dicks's condition and her need for surgery. On documents Mrs. Dicks completed with Dr. Borum's office, she had named her niece as the one to contact for emergency medical situations. Mrs. Dicks never made Dr. Borum aware that she had a daughter. Further, Mrs. Dicks made it clear to her niece that she did not want her daughter contacted about her illness.
¶ 4. Mrs. Dicks underwent the necessary surgery, experiencing subsequent complications and entering into a near-death situation. Mrs. Dicks began to slowly recover from the surgery and spent approximately four weeks in the hospital with several of those weeks in the intensive care unit. During this time, Mrs. Power visited Mrs. Dicks two or three times daily. Mrs. Dicks employed sitters to assist her and be with her in the hospital. Mrs. Power was consulted by all of Mrs. Dicks's caregivers including doctors, nurses and others.
¶ 5. According to Dr. Borum and nurses who cared for Mrs. Dicks, she experienced several periods of disillusionment in which *283 she became angry, severely agitated and both physically and verbally abusive with those caring for her. On one occasion, Mrs. Dicks physically attacked her nurse and attempted to extricate the various tubes used in providing her medications and fluids. For these times, Dr. Borum ordered the drug Haldol to be given to Mrs. Dicks. Haldol is a tranquilizer used to calm patients who are agitated, aggressive or combative. According to her nurses and doctor, this drug effectively calmed Mrs. Dicks, and she thereafter returned to a more peaceful state.
¶ 6. As the date of her discharge approached, Dr. Borum and a hospital social worker, Kim Kaiser, discussed with Mrs. Dicks her medical care needs after leaving the hospital. It was explained to Mrs. Dicks that she would be leaving the hospital with a tube still connected to her abdomen which needed medical care and cleaning. As such, it was known that Mrs. Dicks would need nursing assistance after leaving the hospital. In their discussions with Mrs. Dicks, both Kim Kaiser and Dr. Borum understood that Mrs. Dicks would have the appropriate sitters tend to her at her home. In addition to full-time sitters, Mrs. Dicks would have home health nurses to visit and care for her. However, approximately twenty-four hours prior to her discharge, Mrs. Dicks kicked her sitter out of Mrs. Dicks's room and declared that she intended to fire all the sitters and the home health agency that tended to her care. Ms. Kaiser concluded that it would have been a danger to Mrs. Dicks's health to permit her to return home without full-time care. Ms. Kaiser consulted with Mrs. Power and Dr. Borum about her concerns.
¶ 7. Concerned for Mrs. Dicks's continued welfare, Dr. Borum recommended that she be admitted to a local nursing home for a period of convalescence. The afternoon before she was scheduled to be discharged from the hospital, Dr. Borum discussed with Mrs. Dicks her admission to a nursing home. According to Dr. Borum, Mrs. Dicks agreed with his recommendation and gave her consent to him for her admission to Trace Haven Nursing Home.
¶ 8. On the day of her discharge, Mrs. Dicks indicated to the nurses on duty that she wanted to speak to one of her doctors before being discharged. She verbalized that she was not leaving the hospital until she spoke to one of her doctors. Mrs. Dicks became angry and agitated and violent with her caregivers. The hospital social worker remarked that she was "out of control." Dr. Borum was contacted by one of the nurses concerning her agitated state. Based on what the nurses told him, Dr. Borum ordered that Mrs. Dicks be given an injection of 5 mg of Haldol.
¶ 9. Mrs. Dicks's primary care nurse at that time indicated that Mrs. Dicks was frustrated with her, and the nurse did not feel comfortable giving Mrs. Dicks the injection. Therefore, another nurse working on the station agreed to give Mrs. Dicks the injection. The nurse, with the assistance of yet another nurse on duty, assisted Mrs. Dicks to roll onto her side, and she was given the injection in her hip. Medical records reveal that while Mrs. Dicks stated that she did not want the medicine, she cooperated with the nurses when they rolled her onto her side and gave her the injection. The medicine effectively calmed Mrs. Dicks, though she did not fall asleep. Later, Mrs. Dicks was transported to Trace Haven Nursing Home. It had been four days since Mrs. Dicks's last injection of 2 mg of Haldol.
¶ 10. Prior to Mrs. Dicks's admission to the nursing home, Mrs. Power had visited the facility and was given a tour. At the time of Mrs. Dicks's admission to Trace Haven, Mrs. Power was informed that the power of attorney that she had was insufficient *284 legal authority for signing Mrs. Dicks into Trace Haven. A couple of days after Mrs. Dicks's admission to the nursing home, Mrs. Power obtained a conservatorship over Mrs. Dicks. In so doing, Mrs. Power consulted her attorney who assisted her in also obtaining necessary affidavits from two of Mrs. Dicks's physicians, one of which was Dr. Borum. Thereafter, Mrs. Power was able to sign the necessary paperwork for Mrs. Dicks's stay at Trace Haven.
¶ 11. Mrs. Dicks's daughter, Lillian Pivonka, ultimately learned of her mother's illness and admission to Trace Haven. Mrs. Pivonka contacted her mother and arranged to visit her mother at the nursing home. According to Mrs. Pivonka, her mother did not want to be at the nursing home and needed Mrs. Pivonka's to help get her discharged. After consulting with an attorney, a joint petition to remove the conservatorship was filed dissolving the conservatorship. Mrs. Pivonka assisted her mother in returning home. Mrs. Dicks thereafter employed several sitters to assist her in the daytime hours. Mrs. Dicks suffered a heart attack and died at home several months after her discharge from the nursing home.
¶ 12. Dr. Borum had visited Mrs. Dicks while she was in Trace Haven, and to him she did not give any indication that she was dissatisfied there or that she felt as though she was wrongfully committed there against her will. To Dr. Borum, she seemed to be recovering well. It was his intention that she reside in Trace Haven for a short convalescent period. Mrs. Dicks left the facility about twenty days after she entered it.
¶ 13. Mrs. Power visited Mrs. Dicks in Trace Haven until a time when she discovered that Mrs. Pivonka had come to assist her. According to Mrs. Power, at that point, Mrs. Dicks made it clear that she did not want her niece to visit her any longer.
¶ 14. The Trace Haven administrator, Ms. Linda Crain, testified that Mrs. Dicks was free to leave the facility. She pointed out that Mrs. Pivonka took Mrs. Dicks out of the nursing home prior to a final resolution of the dissolution of the conservatorship, indicating that Mrs. Dicks was free to leave the facility whenever she wanted to. Ms. Crain stated that while there are two notations in Mrs. Dicks's nursing home records indicating that she did not want to be in the nursing home, Mrs. Dicks did not express to Ms. Crain any complaints about being in Trace Haven.
¶ 15. John Marchbanks, the administrator of Mrs. Dicks's estate, contends that, prior to her death, Mrs. Dicks expressed her intention to bring suit against Dr. Borum and others for allegedly drugging her and admitting her into Trace Haven without her consent. In support of its case, the estate submitted the testimony of Dr. Robert Maresh, a psychiatrist, who was accepted by the trial court as an expert in the field of medicine as a medical doctor. Dr. Maresh testified that the amount of Haldol given to Mrs. Dicks on the afternoon of her discharge from the hospital was excessive. Dr. Maresh believed that, based on the records he reviewed, Mrs. Dicks was competent enough to refuse treatment. Further, he believed that Dr. Borum did not have sufficient consent to commit Mrs. Dicks to a nursing home.
¶ 16. In his defense, Dr. Borum stated that he had obtained consent from Mrs. Dicks to admit her to Trace Haven. He stated that he worked with her, Ms. Kaiser and Mrs. Power in deciding the best route to take for Mrs. Dicks's care. To support his case, Dr. Borum offered the testimony of Dr. William Meeks, an internal medicine physician and medical school professor *285 specializing in the field of geriatrics. Having reviewed Mrs. Dicks's medical records and other documents, Dr. Meeks believed that Dr. Borum's administration of Haldol on January 25, 1995, to Mrs. Dicks was appropriate. In addition, Dr. Meeks maintained that Dr. Borum's reliance on Mrs. Dicks's niece in making medical decisions was proper under the circumstances, that is, given that there were no other family members involved in Mrs. Dicks's care.
¶ 17. At the completion of the estate's case, the trial court directed a verdict on the claims of abuse of process and malicious prosecution regarding the conservatorship proceedings. The court left open the challenges of battery and false imprisonment and granted and refused instructions offered by the parties accordingly. At the close of evidence, the estate renewed its motions for a directed verdict and requested a peremptory instruction in its favor; both were denied by the trial court. After the jury entered verdicts for Dr. Borum, post-trial motions were filed on behalf of the estate; such motions were denied and this appeal ensued.
¶ 18. To facilitate the orderly disposition of this case, we have consolidated the numerous assignments of error and will address the issues raised in the following discussion.

ANALYSIS OF THE ISSUES PRESENTED

I. Motion to Amend the Complaint
¶ 19. On September 27, 1996, John Marchbanks filed a complaint against Elizabeth Power and Dr. Borum alleging that Mrs. Dicks was falsely imprisoned by the actions of Mrs. Power and Dr. Borum who were acting in concert with one another. Next, the estate charged that Dr. Borum committed a battery against Mrs. Dicks in ordering the injection of Haldol on the date of her discharge from the hospital. In addition, as stated, the estate, with respect to the conservatorship proceedings, asserted claims of abuse of process and the tort of malicious prosecution by Mrs. Power and Dr. Borum. The complaint includes accusations of the pursuance of a common plan and design to commit these torts by Mrs. Power and Dr. Borum and that the acts complained of caused actual damages in the form of economic loss, emotional distress and mental anguish of Mrs. Dicks. Finally, the complaint includes the statement that "[b]ecause of the intentional nature of the acts of the defendants and because of the gross negligence of the defendants demonstrating a gross, wanton, reckless, willful, and indifferent disregard of the rights of Mrs. Dicks, ... the estate is entitled to recover punitive damages...." On November 26, 1996, the estate sought and was granted the opportunity to amend its complaint to include as defendants Trace Haven Nursing Home and Natchez Community Hospital. The amended complaint, however, did not include additional allegations or complaints against Dr. Borum or Mrs. Power.
¶ 20. Two days before trial was scheduled to begin, the estate again sought to amend its complaint. The proposed, second amended complaint, however, added a claim of negligence against Dr. Borum and deleted the other parties as defendants. In a hearing held before trial, the estate argued that there were no new facts involved in the amended complaint. It asserted that when it disclosed to Dr. Borum what its expert would testify to at trial, it included testimony as to Dr. Borum's deviation from the standard of care owed to Mrs. Dicks. Consequently, the estate argued that nothing new was being introduced into the case and that the facts remained the same. In opposition to the second amended complaint, counsel for Dr. Borum argued that he prepared a defense *286 for Dr. Borum based on the original and first amended complaint which did not assert any allegations of medical negligence. Accordingly, the defense asserted prejudice in the addition of a negligence claim against Dr. Borum. The trial court agreed.
¶ 21. On appeal, the estate argues that the trial court erred in refusing to amend the second complaint and, alternatively, that the original and first amended complaint included a claim of gross negligence which inherently encompassed a simple negligence claim. While the original and first amended complaint do use the phrase "gross negligence," a reading of the entire complaint clearly indicates the estate's intention of asserting the various complaints of intentional torts against Dr. Borum as opposed to a cause of action for medical malpractice sounding in negligence.
¶ 22. Mississippi Rule of Civil Procedure 15(a) explains that leave to amend pleadings should be freely granted by trial courts "when justice so requires." Our review of the record discloses that the estate had ample time to include a medical malpractice claim against Dr. Borum. The fact is that the estate does not challenge the medical care Dr. Borum rendered to Mrs. Dicks prior to the Haldol injection given to her the day of her discharge from Natchez Community Hospital. The estate only challenges Dr. Borum's actions in connection with Mrs. Dicks's discharge to the nursing home. That is not to say the estate could not have challenged his actions from a medical negligence standpoint. It could have, but it did not attempt to do so until two days before trial was to begin. A plaintiff must exercise due diligence in filing a motion to amend a complaint. See Natural Mother v. Paternal Aunt, 583 So.2d 614, 617 (Miss.1991). Our appellate review of this matter involves a determination of whether the trial court abused its discretion in refusing the amendment of the pleadings. McDonald v. Holmes, 595 So.2d 434, 435 (Miss.1992). Under such standard, we find the trial court did not abuse its discretion in refusing the addition of the negligence claim. To add a claim of negligence at such a late date would have caused undue and severe prejudice to Dr. Borum and his defense.
¶ 23. On appeal, the estate assigned as reversible error the decisions of the trial court in denying jury instructions P-7, P-8, P-9, P-10, P-11 and P-12, all of which pertain to claims for negligence. Because we find that the trial court correctly refused the addition of the negligence claim to the estate's case on the day of trial, we likewise find that the trial court did not err in refusing the instructions offered by the estate on the issue of medical negligence.

II. Application of the "Reasonable Standard," the Propriety of Granting Jury Instruction C 6 and Refusing Jury Instruction P 6 and the Motion for a Directed Verdict
¶ 24. The estate asserts that the trial court erred in "applying throughout the trial a `reasonable' standard" to measure Dr. Borum's conduct. Evincing its position, the estate points to the following statements of the lower court in ruling on the parties' respective motions for a directed verdict:
The relevant issues before the court on thisif there are two elements, detention and unlawful detention. The Court finds that even if the facts were to sustain the position in this case, if there was a violation, a technical violation or failure to obtain proper consent, that the proper test is a test of totality of the circumstances, the reasonableness of the actions of the defendant concerning any detention.
*287 The estate maintains that the trial court applied the wrong standard to its case, asserting that it was error to judge Dr. Borum's conduct by what a reasonable doctor would do because to do so runs afoul of a patient's right to refuse treatment despite what a physician might deem "reasonable" in any given situation. The estate vehemently argues that it mattered not that Dr. Borum's conduct was reasonable as consent for the five-milligram dosage of Haldol and for Mrs. Dick's admission to Trace Haven was lacking. Finally, the estate attacks the trial court's alleged erroneous reliance on a reasonable standard found in jury instruction C-6 which states:
The court instructs the jury that false imprisonment consists of the detention of an individual that is unlawful. In determining whether or not the detention is unlawful, you may consider the totality of the circumstances, and whether the actions of the defendant were objectively reasonable in their nature, purpose, extent and duration. If you find from a preponderance of the evidence in this case that Sarah Winston Dicks was detained at Trace Haven Nursing Home, and that the defendant, Charles D. Borum, M.D., proximately caused or contributed to the said Sarah Winston Dicks being so detained against her will, at said Trace Haven Nursing Home, by placing her there as her treating physician on January 25, 1995, without proper consent or permission; and if you further find that said detention was unlawful, considering the totality of the circumstances as to whether or not the actions of Dr. Borum were objectively reasonable in their nature, purpose, extent and duration, then your verdict shall be for the plaintiff on the claim of false imprisonment against the defendant.
However if you find that the plaintiff has failed to prove any of the above elements by a preponderance of the evidence in this case, your verdict shall be for the defendant on this claim.
¶ 25. According to the estate, this instruction was inappropriate because it espouses the wrong standard for evaluating Dr. Borum's actions. The trial court erred, according to the estate, in its refusal to apply the appropriate standards as evidenced by the jury instructions it furnished the jury. We disagree.
¶ 26. The trial court's instruction C-6 is a correct statement of the current law on false imprisonment. In Thornhill v. Wilson, 504 So.2d 1205 (Miss.1987), the Mississippi Supreme Court determined that there was sufficient evidence to support a jury verdict finding that the detention of the plaintiff by law enforcement officers in their investigation of a complaint of gun shots was not unreasonable. In so holding, the supreme court stated: "[O]ur concern is whether the actions of... [the officers] in detaining ... [the plaintiff] were objectively reasonable in their nature, purpose, extent and duration. We make this inquiry by reference to the totality of the circumstances reasonably apparent to persons situated as were ... [the officers] at the time." Id. at 1208 (emphasis added). The supreme court again supported an application of a standard of "reasonableness under the circumstances" in Wallace v. Thornton, 672 So.2d 724 (Miss.1996). In Wallace, the court observed that the question of whether a detention was unlawful "turns on whether, looking at the totality of the circumstances, the actions of the defendants were `objectively reasonable in their nature, purpose, extent and duration.'" Id. at 727 (quoting Thornhill, 504 So.2d at 1208). In our case, instruction C-6 practically mirrors the current status of the law, as *288 set forth in the aforementioned cases, regarding the proper standard to be utilized in determining a false imprisonment claim. The reasonableness of Dr. Borum's actions was the appropriate standard by which to measure his actions.
¶ 27. What the estate disagrees with is the jury's determination, apparently, that there was valid consent. The estate advances that where "statutory medical treatment consent" is involved, the issue of consent "prevails." The estate points us to section 41-41-3 of the Mississippi Code in effect at the time the relevant facts occurred in this case. Section 41-41-3 is titled "Who May Consent to Surgical or Medical Treatment or Procedures." As the estate avers, someone in the position of a niece to a patient is not listed among those permitted by statute to give consent. Rather, one in the position of husband, wife, son or daughter, or brother or sister is allowed by the statute to give medical consent where the patient is of "unsound mind." Miss.Code Ann. § 41-41-3 (Rev.1993).[1] As such, the estate maintains that Mrs. Power was not in a statutorily-prescribed position to give consent and that Mrs. Dicks did not give her consent to the Haldol injection or to being committed to a nursing home. Consequently, the estate maintains that because there was no valid consent, Dr. Borum committed a battery and is liable for the false imprisonment of Mrs. Dicks.
¶ 28. One commits a battery by the very touching of another without his consent. Mississippi adheres to the basic belief that a patient is "master of his/her own body," Fox v. Smith, 594 So.2d 596, 604 (Miss.1992), a concept that was advocated in Phillips By and Through Phillips v. Hull, 516 So.2d 488 (Miss.1987). The premise for the consent requirement applicable to physicians is found in tort law involving assault and battery which is the legal doctrine protecting the rights of every individual to be touched only when and in the way authorized by that person. Fox, 594 So.2d at 604. "Medical and surgical procedures that involve touching a patient's person, even the simplest manipulation of a limb, must be properly authorized or the person performing the procedures will be subject to an action for battery." Phillips, 516 So.2d at 491-92 (citations omitted). Unless there are special circumstances, "a competent individual has a right to refuse to authorize a procedure, whether the refusal is grounded on doubt that the contemplated procedure will be successful, concern about probable risks or consequences, lack of confidence in the physician recommending the procedure, religious belief, or mere whim." Phillips, 516 So.2d at 491-92 (citation omitted).
¶ 29. Mrs. Dicks first saw Dr. Borum in March 1994. On her first visit to his office, she provided her written patient information indicating that Elizabeth Power should be contacted in the case of a medical emergency. She was admitted to the hospital the day after Christmas 1994. The trial court record does not contain any type of signed "general" consent form by Mrs. Dicks for her admission to the hospital and for medical treatment. However, the medical records reflect a series of consent forms regarding the surgery, anesthesia and other medical treatment involved in her surgery. All but one of the forms were signed "Sarah Dicks by Elizabeth Power." One consent form was by Mrs. *289 Dicks herself. As stated, the estate does not challenge any of the medical treatment rendered by Dr. Borum to Mrs. Dicks during her hospital stay except for the dose of Haldol on the day of her discharge. In fact, Mrs. Dicks's daughter indicated that the treatment provided by Dr. Borum and the hospital saved her mother's life.
¶ 30. The medical records and testimony show that Mrs. Dicks had several doses of Haldol administered to her during her stay in the hospital. As such, it is apparent that any issue regarding consent for treatment prior to the day of discharge was waived. Her need for the drug was also made clear to the jury as several witnesses testified to her episodes of combative, aggressive and uncontrollable behavior. With the exception of the last occasion on which Dr. Borum ordered the drug to be given to her, no one testified that Mrs. Dicks did not give her consent to be given such medication. There is no indication that she rejected the medication at any of the other times she was given medical treatment ordered by Dr. Borum. There was testimony that on the day of her discharge, she again became aggressive and agitated. She was described as being out-of-control. While Mrs. Dicks made statements that she did not want the medication ordered by Dr. Borum, she did not resist after she was assisted in rolling onto her side to be given the injection.
¶ 31. As to her admission to Trace Haven, the estate contends that Mrs. Dicks did not give her consent and that Dr. Borum's actions in giving her the Haldol and in signing the statement that Mrs. Dicks was not competent, allowing Mrs. Power to obtain a conservatorship, caused her unlawful detention in Trace Haven. Dr. Borum testified that on the afternoon prior to Mrs. Dicks's discharge, he had a lengthy conversation with her about her admission to a nursing home. He testified that she gave him her full consent to be admitted to the nursing home.
¶ 32. In addition to being instructed on the elements of the torts of a battery and false imprisonment, the jury was instructed in accordance with section 41-41-3 of the Mississippi Code that "a niece" is not among those statutorily permitted to give consent for medical treatment for an aunt. The court's instruction on battery included the element of lack of consent as did the instruction on false imprisonment. The jury's verdict, however, infers that consent for the medical treatment of the injection of Haldol was effectively given and that Mrs. Dicks had effectively given her consent for admission to Trace Haven.
¶ 33. The estate challenges the trial court's refusal of its peremptory instruction and its unwillingness to enter a directed verdict in its favor. Upon appellate review, we consider the evidence in the light most favorable to Dr. Borum, giving the defense the benefit of all favorable inferences which may be reasonably discerned from the evidence. American Fire Protection, Inc. v. Lewis, 653 So.2d 1387, 1390 (Miss.1995). If, however, the facts considered point so overwhelmingly in favor of the estate that reasonable men could not have reached a contrary verdict, we are compelled to reverse and render. Id. With this standard in mind and our conclusion that the trial court applied the correct standard, we find that the evidence, and the reasonable inferences flowing therefrom, do not establish overwhelmingly that the estate was entitled to a judgment in its favor. Given the fact that Mrs. Dicks, during her initial medical visit to Dr. Borum's office, had designated Mrs. Power as the person to contact in case of an emergency, as well as the fact that Mrs. Dicks had accepted other injections of Haldol during her hospital stay and ultimately *290 did not resist the injection in question, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions relative to the issue of consent. Consequently, we cannot say the trial court erred in refusing to grant a directed verdict on behalf of the estate.

III. Jury Instructions P 6B, P 6C, and P 6D

¶ 34. Jury Instructions P-6B, P-6C, and P-6D were offered by the estate and denied by the trial court. Instruction P-6B reads as follows:
If you believe from a preponderance of the evidence that Mrs. Dicks was not of sound mind on January 25, 1995, and that Dr. Borum ordered Haldol administered to her without seeking and obtaining legal authority to do so, Dr. Borum's actions nevertheless constituted a battery, and your verdict shall be for the plaintiff against Dr. Borum
The trial court denied the instruction on the basis that the jury could find that no battery occurred notwithstanding the fact that Dr. Borum did not seek legal authority to administer the injection.
¶ 35. Jury instruction P-6C states:
Every human being of adult years and sound mind has a right to determine what shall be done with his or her own body. If you believe from a preponderance of the evidence that on January 25, 1995, Dr. Borum caused or contributed to the confinement of Mrs. Dicks at Trace Haven Nursing Home without her consent, then your verdict shall be for the plaintiff against Dr. Borum.
While the trial court agreed that the first sentence of the instruction was a correct statement of the law, the remaining portion, according to the trial court, was not. Finally, jury instruction P-6D provides:
If you believe from a preponderance of the evidence that on January 25, 1995, Mrs. Dicks was not of sound mind but that Dr. Borum caused or contributed to her placement at Trace Haven Nursing Home without obtaining legal authority to do so, then her confinement at Trace haven Nursing Home was an unlawful detention, and your verdict shall be for the plaintiff against Dr. Borum.
The trial court denied this instruction because it was improper and that the jury was adequately instructed on the elements of an unlawful detention by virtue of other instructions given.
¶ 36. In determining whether there is reversible error in the granting or refusal of various instructions, the instructions actually furnished to the jury must be read as a whole. Fielder v. Magnolia Beverage Co., 757 So.2d 925, 929 (Miss. 1999). When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. Fielder, 757 So.2d at 925. We have reviewed all the instructions granted by the trial court and all those it denied. The instructions given to the jury in fact fairly announced the law to be applied to the case and did not create an injustice so as to warrant a reversal.

IV. Jury Instruction D-12

¶ 37. The trial court instructed the jury as follows:
You shall not award any damages in favor of the Plaintiff in this case unless you find from a preponderance of the evidence that Dr. Borum intentionally committed acts against Mrs. Dicks.
The estate objected to the instruction because, in its view, intent is irrelevant and the instruction effectively eliminated a negligence claim. Battery and false imprisonment are intentional torts. See Miss.Code Ann. § 15-1-35 (Rev.1995); *291 City of Mound Bayou v. Johnson, 562 So.2d 1212, 1220 (Miss.1990). In addition, negligence was not a claim properly asserted by the estate. Under the standard for reviewing jury instructions set forth in the previous section, we find no error.

V. Jury Instruction C-3 and C-4.

¶ 38. Jury instructions C-3 and C-4 are jury verdict forms. Instruction C-3 addresses the battery claim while instruction C-4 addresses the false imprisonment claim and reads as follows:
The court instructs the jury, as to the plaintiff's claim of false imprisonment against the defendant, Charles D. Borum, M.D., that, if you find from a preponderance of the evidence, for the plaintiff on this claim, your verdict shall be in the following form:
"We, the jury, as to the claim of false imprisonment, find for the plaintiff, and assess damages on this claim in the amount of $ _____."
If you find from a preponderance of the evidence, for the defendant, on the claim of false imprisonment, your verdict shall be in the following form:
"We, the jury, as to the claim of false imprisonment, find for the defendant." Your verdict should be written on a separate sheet of paper.
Instruction C-3 was in a similar format. Counsel for the estate argues that the separate verdict forms for the two torts rather than a single general verdict "provided virtual assurance that the plaintiff would lose before the jury." Further, he argues "the idea of a jury trying to determine separate damages for two torts that are so interrelated would provide mindbending confusion to even the most astute judges and lawyers as well as the most astute jurors. It makes one's head hurt to try to figure how a person could possibly arrive at logical figures, even if the inclination was to award a plaintiff's verdict." Additionally, the estate maintains that the verdict forms issued constituted special verdicts under Rule 49 of Mississippi Rules of Civil Procedure.
¶ 39. We disagree. We find nothing erroneous in either jury verdict forms or in the trial court's issuance of two forms addressing the two different torts involved. The jury could have determined that a battery occurred but Mrs. Dicks was not falsely imprisoned or vice versa. It was appropriate for the trial court to separate the two verdict forms. We find the estate's arguments in this regard are wholly without merit.

VI. Testimony of Elizabeth Power
¶ 40. The testimony of Elizabeth Power was offered through the testimony she gave in a deposition. The parties submitted to the trial court prior to trial those portions of the deposition that each wished to be placed before the jury. In addition, both parties were permitted to object prior to trial to certain excerpts of testimony. The estate appeals the trial court's decision to allow testimony where Mrs. Power stated that Mrs. Dicks did not have a good relationship with Mrs. Dicks's daughter. Dr. Borum defended the admission of the testimony at trial, and does so on appeal, on the basis that the testimony regarding Lillian Pivonka's estranged relationship with her mother was relevant because it explained why Mrs. Power was at Mrs. Dicks's side during her hospital stay. Simply put, it explained why Dr. Borum consulted with Mrs. Power regarding Mrs. Dicks's medical condition.
¶ 41. The estate argues that Mrs. Pivonka had no role whatsoever in the causes of action being asserted by the estate. Further, the estate contends that Dr. Borum's attorneys were permitted to "Lillian Bash" and create bias and prejudice *292 against Mrs. Pivonka through the use of Mrs. Power's testimony.
¶ 42. The trial court determined that the testimony in issue was relevant and would be allowed into evidence. Trial court decisions concerning the relevancy of testimony fall in the sphere of discretionary decisions afforded trial courts. Terrain Enterprises, Inc. v. Mockbee, 654 So.2d 1122, 1131 (Miss.1995). We will not reverse a trial court's ruling regarding the relevancy of testimony unless we find that the court abused its discretion. Id. We find no abuse of discretion here and likewise find no merit to the estate's arguments.

VI. Punitive Damages
¶ 43. Lastly, the estate argues that the trial court erred in prematurely determining that punitive damages would not be awarded. Because we have found no errors warranting a reversal in this case, any error by the trial court in prematurely determining that the jury would not be instructed on punitive damages is rendered moot.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF ADAMS COUNTY IN FAVOR OF APPELLEE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS and CHANDLER, JJ., CONCUR.
NOTES
[1] In 1998, this statute was changed, and under the present statutory scheme, Mrs. Power, as a designee or surrogate, could give consent for medical treatment for Mrs. Dicks. See The Uniform Health Care Decisions Act, Miss. Code Ann. §§ 41-41-201 through 299 (Supp. 2000).