594 So.2d 596 (1992)
Lana FOX
v.
Dr. Perrin N. SMITH.
No. 89-CA-227.
Supreme Court of Mississippi.
January 22, 1992.
Dennis Harmon, Columbus, for appellant.
Taylor B. Smith, Mitchell McNutt Threadgill Smith & Sams, Columbus, for appellee.
Before DAN M. LEE, P.J., and PITTMAN and BANKS, JJ.
DAN M. LEE, Presiding Justice, for the court:
This is an appeal from a directed verdict granted in favor of the defendant at the close of the plaintiff's case-in-chief. Mrs. Lana Fox, a former patient of Dr. Perrin Smith, filed an action in the Lowndes County Circuit Court alleging that Dr. Smith committed a battery to her person by the unauthorized removal of Mrs. Fox's intrauterine device (hereinafter IUD).
Mrs. Fox checked into the Golden Triangle Regional Medical Center on an outpatient basis for a laparoscopy to be performed by Dr. Smith. During the course of this procedure, Dr. Smith observed that the IUD which Mrs. Fox was wearing was *597 fragmented and in a degenerative condition. Consequently, Dr. Smith removed the IUD and probed the uterus to ensure that no particles of the IUD remained in the body. At trial, Mrs. Fox adamantly maintained that she never consented to the removal of the IUD. By contrast, Dr. Smith testified that Mrs. Fox entrusted the decision to remove the IUD to his medical judgment.
This case turns on the issue of consent, or not, for the removal of Mrs. Fox's IUD. Both parties testified to a very different version of facts regarding the doctor's consent to remove the IUD. Consequently, this case presented a classic jury question of credibility in so much as both parties testified to events which cannot be reconciled. For this reason, we reverse the directed verdict entered in this case and remand the same to the lower court for a new trial on the merits.

FACTS
The facts in this case will be presented in the form of trial testimony summaries. For comparative purposes, this approach will highlight the differences in the version of events as testified by Mrs. Fox and Dr. Smith.

LANA FOX'S VERSION OF EVENTS
Lana Fox has worked as a lab technician for most of her adult life at various places in Florida and later in Mississippi. One significant experience in her work background was a ten (10) year stint with the University of Florida and the federal government where Mrs. Fox was engaged in cancer research which involved working with carcinogens. From the record, it appears that this employment was from 1970 until May of 1980. In 1971, Lana met and married her husband, Donald Fox, who was also a lab technician working for the federal government in Gainesville, Florida. In May of 1980, Mrs. Fox and her husband moved from Florida to the State of Iowa. In 1984, Donald Fox secured a job in Columbus, Mississippi, as a lab technician in the hospital located on the Columbus Air Force Base. Thus, the Foxes moved to Mississippi and settled in Caledonia. Once the Foxes were settled in Mississippi, Mrs. Fox worked various odd jobs for temporary periods of time which included work in a couple of medical groups in Columbus. However, in the fall of 1985, a new medical clinic, Emergi-Care, opened in Columbus. Mrs. Fox was employed at Emergi-Care as a lab technician when the facility opened, and she was still employed there at the time of trial in August of 1988.
On December 31, 1985, Mrs. Fox experienced a severe attack of abdominal pain, and she contacted one of the physicians at Emergi-Care where she worked. The physician provided some medication which eased the pain, and she returned to work at the clinic with no complications. However, the physician at Emergi-Care recommended that she see a gynecologist because he suspected that a cyst could be one possible cause for her pain. Therefore, on January 8, 1986, Mrs. Fox went to see Dr. Perrin Smith, an obstetrician-gynecologist of the Columbus Women's Clinic. Mrs. Fox's complaint was severe lower abdominal pain. Dr. Smith did a pelvic exam and suspected that Mrs. Fox had endometriosis or possibly a cyst. Dr. Smith recommended an out-patient laparoscopy so that he could determine a diagnosis. Mrs. Fox informed Dr. Smith that she would think about it and would be back in touch. Although Dr. Smith conducted a pelvic exam, Mrs. Fox alleged that Dr. Smith never mentioned the IUD to her at this first visit, and she never mentioned it to him.
Mrs. Fox sought a second opinion. She made an appointment with Dr. Miles of the same medical group, Columbus Women's Clinic, and on February 14, 1986, Mrs. Fox saw Dr. Miles. According to Mrs. Fox, she told office personnel at the second visit that she was there for a second opinion; however, she also told office personnel that she had never been there before, and a new chart was started for her. Apparently, Mrs. Fox believed that if Dr. Miles knew that her "first opinion" was from his medical partner, Dr. Smith, then she might not get a truly unbiased opinion. Dr. Miles provided the same information as Dr. *598 Smith. That is, she might have endometriosis or a cyst, and a laparoscopy was needed in order to confirm a diagnosis. When Dr. Miles provided the same diagnosis as Dr. Smith, Mrs. Fox then informed him that Dr. Smith was her "first opinion" and that she had a laparoscopy tentatively scheduled with him. According to Mrs. Fox, she and Dr. Miles discussed the IUD at the February 14th appointment.
When he did the pelvic exam he says, `I see you have a IUD.' I said, `Yes, it's a CU-7; it's been in a long time.' And we discussed how long it had been in. He said, `Well they recommend that they be changed much more frequently.' And I told him I realized that and I had been intending to do so at some time, and I had kind of put if off because I was having no problems, no pain, no discomfort, and like most manufacturer rec  any recommendations and all it's done to protect the company as much as anything, and since I was having no discomfort, no problems, I didn't see any reason to change horses when I was doing fine.
Dr. Miles offered to remove her IUD at this visit, but Mrs. Fox declined the offer. Mrs. Fox acknowledged that her IUD was long overdue for a change, but she testified that if Dr. Smith found cancer, he had mentioned that a total hysterectomy might be required. Therefore, if she had cancer, she saw no reason for paying Dr. Miles for the removal of an IUD if she eventually ended up with a total hysterectomy. At trial, Mrs. Fox guessed that she had been wearing this particular IUD, CU-7, manufactured by the Searle Company, for six or seven (6-7) years. However, on cross-examination, she gave the question additional thought and testified that she had been wearing the same IUD for ten to twelve (10-12) years. Evidence in the record indicates that this particular IUD should be replaced every three (3) years.
In the meanwhile, Mrs. Fox scheduled the laparoscopy for February 27, 1986, with Dr. Smith. Two days prior to the procedure, February 25, 1988, Mrs. Fox went to see Dr. Smith in what was described as a pre-op visit. According to Mrs. Fox, Dr. Smith did not examine her during this visit, and her IUD was not discussed. During this visit, Mrs. Fox informed Dr. Smith that she once worked with carcinogens as a lab technician, and for that reason, she feared that he might find a cancerous tumor. Consequently, Mrs. Fox gave special instructions to Dr. Smith for the preservation of any tissue specimens that he removed from her body in the event she had cancer, so she might be able to trace the causation to her research work of prior years. Apparently, Mrs. Fox wanted the specimens for any potential evidentiary value that it might have in a possible lawsuit. According to Mrs. Fox, "[h]e (Dr. Smith) said there would be no problem preserving the specimens as I requested. There was no discussion of the IUD, it was never brought up."
Mrs. Fox testified that Dr. Smith requested that she and her husband be checked into the hospital an hour before the surgery was scheduled so that he could discuss the procedure in more detail when her husband was present:
He said since we were talking about possible hysterectomy or partial removal of internal organs and all like that, that he preferred that my husband be there; in fact, he asked me wasn't my husband with me when I arrived that morning and I said, no, he wasn't, he was working, and he said that since, you know, this would possibly be a necessary procedure that he preferred that my husband be in on those conversations since it would affect our lives, both of us, depending on what type of surgery would be done, therefore he said he didn't really think we should go into it then because he would  He would feel obligated to go through it again Thursday morning with my husband present so that he would know what to expect after the surgery and what might possibly be done, and so we arrived before six o'clock even though I was scheduled for seven o'clock surgery.
Mrs. Fox testified that she and her husband arrived an hour early as requested in order to meet with Dr. Smith prior to surgery. Significantly, both Mrs. Fox and her *599 husband steadfastly maintain that Dr. Smith never came to the room to see them prior to the surgery. According to Mrs. Fox, she did not see Dr. Smith until she was on the operating table and was being prepped for surgery.
Q. Okay, in the OR here was there any discussion about an IUD?
A. Only when Dr. Smith came in.
Q. Okay, tell us about that if you would.
A. Do you want me to start at the beginning of the OR or at  when Dr. Smith came in because there are several things that happened in the operating room before he arrived?
Q. Okay, well tell us about what Dr. Smith  what Dr. Smith told you about the IUD.
A. He walked in the room and says, `Good morning,' you know, or  No, he said, `Hi, there, are you ready to get that IUD out and have that D and C?' And I thought the man was crazy or badly confused; he didn't know what patient I was, and I said  I looked straight at him and I re  you know, `No, I'm not here to have a D and C. I do not want my IUD out. I am here for a laparoscopy only.'
* * * * * *
A. He [Dr. Smith] just looked, you know, he had his mask on; he was kind of, you know, you can just see him grinning and at that point he had come closer to the stretcher and he put his  You know, kind of patted me on the left shoulder like there, there, little girl, and I felt a  a very burning sensation in my shoulder and I said, `Ow, my shoulder is burning,' and Mr. Richardson said he was injecting, and I started yelling, `No, stop.' I said it three times that I can recall before I became unconscious.
Following surgery and a brief stay in the recovery room, Mrs. Fox was brought back to her room. When Mrs. Fox awakened from surgery, she discovered that her IUD had been removed and that she had had a D & C. Dr. Smith came by the room following surgery and talked with Mr. Fox. Mrs. Fox was awake at this point, but she was still groggy. Dr. Smith informed Mr. Fox that the laparoscopy revealed mild endometriosis which could be treated with medication, and he found some adhesions which he transected. No cyst or cancer was indicated. Dr. Smith testified that he informed Mr. Fox that he removed the IUD and the reasons for doing so. Allegedly, Mr. Fox thanked Dr. Smith for removing the IUD and commented that he and his wife had discussed the need to replace it. According to Mr. Fox, his wife was livid with anger when she left the hospital. When Mrs. Fox regained her senses, Mr. Fox quickly learned that Mrs. Fox did not want her IUD removed.
The Consent Form: Once Mrs. Fox was checked into the hospital on the morning of February 27, 1986, Nurse Perian Grimes brought in a consent form for her to sign. At trial, Mrs. Fox testified that she pointed out to Nurse Grimes that she had made special arrangements with Dr. Smith for the preservation of her specimens. Therefore, Nurse Grimes made a notation on the form that she (Fox) had discussed this with Dr. Smith. The following is Mrs. Fox's testimony on this point:
She came in when they brought us up from admitting; uh, she brought the surgical permit and had asked me to sign it. I said, `Well I  I read everything before I sign it.' And as I read the paper she took my vital signs and I finished the paper before she finished the vital signs, and I said, `I have only one correction here at the bottom where it says about medical specimens,' I said, `I had told Dr. Smith in the office that there were three methods by which I wanted the pathology lab to preserve the specimens and therefore I didn't want them to just merely go to pathology without those instructions because the specimens could be destroyed for what might, you know, be necessary later as far as recouping costs for cancer which is extremely expensive and I had been exposed to carcinogens in my work with the federal government in cancer research; it was documented in my personnel file, but if the specimens were destroyed or improperly handled, then there would be a lot of *600 hassle in getting the payments for the surgery and for follow up care for cancer if the specimens were not handled properly by the pathology lab.'
According to Mrs. Fox, once Nurse Grimes made a notation on the consent form about her discussion with Dr. Smith concerning the preservation of specimens, she then agreed to sign the form. On cross-examination, Mrs. Fox provided additional details of her initial reluctance to sign the surgery consent form:
Q. And the only thing you objected to was the section down there authorizing and directing the hospital pathologist to use his discretion in the disposal of any severed tissue or member, right?
A. I objected to two  two points on the paper in talking with the nurse. I said, `About this part that says they can do any other procedure,' I said, `I'm only here for a laparoscopy. Should I strike this out?' And she said, `No, that's there mostly in case you would like to go [sic] into arrest or if there would be bleeding and they would have to do something to stop the bleeding and so they put that in there to cover anything that might accidently happen that would require them to do life saving measures.' And I said, `Okay, I can  I can handle that.' And then I went down to the next part where I had her write in 
Q. Right.
A.  That I had discussed this with Dr. Smith and he knew from our discussion in his office the prev  two days before how the specimens were to be handled; they weren't just to be handed to pathology; there were to be specific instructions.
Q. So that part of the consent you wanted some writing put in on it, right?
A. Definitely.
The two paragraphs in the consent form which Mrs. Fox describes in the above testimony are as follows:
I recognize that, during the course of the operation, unforeseen conditions may necessitate additional or different procedures than those set forth above. I, therefore, further authorize and request that the above named surgeon, his assistants or his designees perform such procedures as are, in his professional judgment, necessary and desirable, including but not limited to procedures involving pathology and radiology.
* * * * * *
3. I hereby authorize and direct the hospital pathologist to use his discretion in the disposal of any severed tissue or member, except ____
In the blank space at the end of item three following the word "except," there is a handwritten note which states, "consult with Dr. Smith  discussed this with patient".
On April 7, 1988, when Lana Fox went to see Dr. Smith for a post-op follow-up, she confronted him about the IUD removal and the D & C. Mrs. Fox testified that even before she went to see Dr. Smith, she had decided that she would sue him and that she was on a "mission."
Regarding damages, Mrs. Fox testified that following the surgery by Dr. Smith, she felt, "dirty," "demoralized," and "used." Mrs. Fox testified that she suffered from depression and had withdrawn from society in general. She testified that she could not trust people, especially medical doctors. She also testified that it was difficult to have sex and that this had caused marital problems. Mr. Fox testified that his wife underwent an "abrupt personality change." Mr. Fox stated that his wife lost interest in gardening and in activities that they both enjoyed in the past such as hunting and fishing. "She doesn't seem to get as much enjoyment out of life as she did before."

DR. SMITH'S VERSION OF EVENTS
In all significant instances, Dr. Smith's version of events is very different from that of Lana Fox.
Dr. Smith explained that when Mrs. Fox first came to see him she complained of abdominal pain and excessive bleeding during menstrual periods. According to Dr. Smith, he and Mrs. Fox did discuss her IUD on this first visit on January 8, 1986. *601 Dr. Smith testified that they discussed the IUD on January 8th, and he recommended removal of the IUD. Additionally, Dr. Smith, testifying from Lana Fox's medical records, explained that Mrs. Fox's chart indicated that he also discussed the IUD with Mrs. Fox during the pre-op office visit on February 25, 1986. This is a sharp contrast from the testimony of Mrs. Fox wherein she claims that the first time that Dr. Smith ever mentioned the IUD removal was in the operating room only seconds before she was put to sleep. In the excerpt which follows, Dr. Smith is testifying and reading from his office chart on Lana Fox for the entries made on February 25, 1986:
A. Surgery, appendectomy. Medicines presently taking, none. Last menstrual period, two, three, eighty-six. Full discussion with patient, quote, `Don't want IUD removed. She is aware of recent Searle lawsuits and advised for  from Searle, but does not 
BY MR. SMITH: Excuse me, I have no 
A.  But wishes not to remove IUD, but use your own judgment,' quote.
As indicated by the testimony quoted above, Dr. Smith alleged that the IUD was discussed with Mrs. Fox in both office visits prior to surgery. Mrs. Fox allegedly informed Dr. Smith that she did not want the IUD removed even though she was aware of consumer lawsuits against Searle Company, the manufacturer. On February 25, 1986, following Mrs. Fox's office visit, Dr. Smith dictated a "physical examination" report to the hospital via telephone. Regarding the IUD, the report stated, "She has a CU-7 present. Does not want it removed."
The contrasts between Dr. Smith's and Mrs. Fox's story sharpen. Dr. Smith further testified that he came to Mrs. Fox's room prior to surgery, a fact which Mr. and Mrs. Fox adamantly deny. According to Dr. Smith, when he arrived at the hospital, he received word that Mrs. Fox had refused to sign her consent form, and he went to visit her. The testimony which follows describes Dr. Smith's version of what transpired in Lana Fox's room prior to surgery:
Q. Well tell me again what  what the discussion was with Mrs. Fox in her room on February twenty-seventh?
A. To the effect that we're going to do a laparoscope. `I know you don't want your IUD out.' `No, I don't want my IUD out, but if I think it's a problem or find any difficulty, well certainly you ought to take it out.' ...
* * * * * *
Q. Was there any discussion there in the room about `Take it out if you think it's necessary,' or anything like that?
A. Yeah, that's what I was just saying. If you  `I don't want it out, doctor Smith.' `I understand, Mrs. Fox, you don't want it out, but if we find that that's a major problem it ought to come out.' Total agreement.
As a result of this conversation with Mrs. Fox on the morning of surgery, Dr. Smith made the following handwritten note on her "physical examination" report: "On rounds this am 2-27-86 pt has decided to have old cu 7 removed and consider another one /s/ pns." Dr. Smith testified that his understanding with Mrs. Fox was that even though she did not want the IUD removed, she left the decision to remove to his professional judgment.
Dr. Smith also described a meeting with Lana Fox in the holding area of the operating room just prior to surgery:
A.  there was a RN there in surgery said that Mrs. Fox wanted to see me again, and I went in there ... And she was asking  I think she goes through a list of what's going to be done and she said, `A laparoscope and anything else  Well if my IUD needs to come out we're going to take it out, but I don't want to take it out; I mean that was the general gist of the  so we were going to do a laparoscope and whatever was necessary.
Q. But she did tell you there also that if the IUD needs to come out 
A. That's correct.
Q.  It could?

*602 A. That's correct.
Dr. Smith described the laparoscopy. An incision is made just below the navel, and CO2 gas is then injected into the incision. The gas fills the belly and lifts the internal organs. An optic tube is then inserted which allows viewing of the internal organs. This allows the surgeon to examine the internal organs in the pelvic area such as the ovaries, fallopian tubes, etc. Other internal organs such as the bowels and gallbladder are also examined. Dr. Smith testified that the procedure revealed that Mrs. Fox had mild endometriosis.
Dr. Smith explained that as he was placing the laparoscopy instruments in place, he observed that the IUD was extruding from the cervix and was in poor condition.
A. Part  Again an IUD is part plastic and part copper; that copper is tightly wound; this was beginning to unwind and you don't know the extent or what's missing. The plastic appeared somewhat calcified, eroded; The plastic part itself did not appear separated into many piece  any pieces, the copper did, but because of the condition of the plastic and the copper which are, use the word fragmented, torn up, unwound, in pieces, and then coated heavily with a lot of tissue reaction which any foreign object in the uterus is just going to have a lot of blood and  and fibrous tissue or hard tissue around it.
Since the copper part of the device was beginning to unwind, Dr. Smith explained that it was necessary to probe ("curettage") the uterus to determine if any foreign particles remained in the body. Dr. Smith explained that he did not perform a true D & C but that the term "D & C" appeared on Lana Fox's records so that the procedure would be understood by the insurance company for billing purposes.
Q. The circulator says that you did do a D and C. Now where is the difference?
A. Well the difference  There's a tremendous amount of difference in how you might code something out for insurance purposes and how it is more clearly understood by everyone and the actual procedure. As you know, in  with  with medical insurance and I suppose with any kind of insurance you've got ways that they can look at a procedure and say this or that was or wasn't done and get an understanding. Now when you dilate the cervix  the cervix is the opening to the uterus; Does anybody not understand what I'm talking about? Now the term D and C means you dilate or make wider the cervix; we didn't do a dilatation. A curettage means you scrape. Now if you want to say that you take an instrument and search the uterus briefly for any remaining fragments of whatever kind of tissue, yes, that's what we did. When you realize that that should be done, you take a small instrument called a Novac Curette, which is a very thin, almost pencil  a little bigger than a pencil lead, and you insert it into the uterus, so technically no dilatation was ever done, no curettage; a search for any portions of tissue or fragments of IUD in this particular case was made.
* * * * * *
In my handwriting what I imply to the circulator and I think everyone understands this, if you instrument the uterus you've got a code that is easily understood. `Doctor Smith, what should we code out?' `Make it simple, we can put down D and C, removal of IUD.' `We didn't dilate the cervix, Doctor Smith; we didn't curette the cerv  the uterus.' I realize that, but for coding, technical purposes I think it's easier to put that as a D and C and laparoscope, and I'm sure that's what I said... .
Dr. Smith testified that he removed the IUD in the exercise of good medical judgment. According to Dr. Smith, it would have been poor medical judgment to have left the IUD in place. In addition to the poor condition of the IUD, Dr. Smith was aware that the CU-7 had been the subject of consumer lawsuits against the manufacturer, Searle Company. Additionally, Dr. Smith knew that this particular IUD had been in place for years beyond the manufacturer's recommendation.
Finally, Dr. Smith described the health hazards which could have resulted if he *603 had left the IUD in place and not removed it.
Well the possibilities are several; She was already having a health hazard, number one, from her infection and pain and prolonged bleeding. The possibilities are the longer it's left in the more infection, the more chance of pelvic abscesses or pus in the belly, the more chances of having to have a hysterectomy, the more chances of obstructing your bowel, and having to have part of your bowel resected, the more chance of losing your ovaries, the more chance of being infertile, the more chances of dying if it gets into the wrong place, the more chances and not at all to be humorous, but there have been numerous cases of where the male has torn his penis from a partially extruded IUD; That's another hazard when one is into the vaginal canal.

Nurse Perian Grimes
Registered Nurse Perian Grimes was the admitting nurse for Lana Fox on February 27, 1986. Nurse Grimes testified that she remembered Lana Fox very well. According to Nurse Grimes, Mrs. Fox refused to sign the consent form because she objected to a clause in the form which authorized the hospital to dispose of severed tissues or specimens. Nurse Grimes left the room to call Dr. Smith at home, but Dr. Smith soon arrived at the hospital. Nurse Grimes did not remember if Dr. Smith visited Mrs. Fox before surgery. She did not remember being present in the room when Dr. Smith attended to Mrs. Fox in the room that morning. However, since Mrs. Fox eventually agreed to sign the consent form, this indicated to Nurse Grimes that Dr. Smith did, in fact, visit with Lana Fox in her room prior to surgery that morning.

Standard of Review
The decision to grant a directed verdict is one of law. When a motion for directed verdict is made, the court must consider all of the evidence in the light most favorable to the nonmoving party (Fox). Wells Fargo Armored Service Corp. v. Turner, 543 So.2d 154, 157 (Miss. 1989); Upton v. Magnolia Elec. Power Ass'n, 511 So.2d 939, 942 (Miss. 1987); Hammond v. Grissom, 470 So.2d 1049 (Miss. 1985); McGaugh v. Gray, 495 So.2d 1024 (Miss. 1986). In considering the evidence and all reasonable inferences, the court must determine whether the evidence is so overwhelmingly against Lana Fox that no reasonable juror could have found in her favor. Wall v. Swilley, 562 So.2d 1252, 1256 (Miss. 1990); Wells Fargo Armored Service Corp. v. Turner, 543 So.2d 154, 157 (Miss. 1989); Brewer v. Williams, 542 So.2d 1186, 1187 (Miss. 1989); Hall v. Mississippi Chemical Express Inc., 528 So.2d 796, 798 (Miss. 1988); Rester v. Morrow, 491 So.2d 204 (Miss. 1986).
A directed verdict pursuant to M.R.C.P. 50(a) is not an appropriate means for the disposition of a case so long as questions of fact are raised in the proof at trial. Bank of Shaw v. Posey, 573 So.2d 1355, 1361 (Miss. 1990). It is fundamental in our jurisprudence that questions of fact are for a jury; questions of law are for the court. Cantrell v. Lusk, 113 Miss. 137, 73 So. 885 (1917). The comment to M.R.C.P. 50(a) emphasizes that the facts must be "sufficiently clear" as a prerequisite for the application of law on a motion for a directed verdict:
Rule 50 is a device for the court to enforce the rules of law by taking away from the jury cases in which the facts are sufficiently clear that the law requires a particular result... .
... . The rule enables the court to determine whether there is any question of fact to be submitted to the jury and whether any verdict other than the one directed would be erroneous as a matter of law. .. .
... . [T]he court should look solely to the testimony on behalf of the opposing party; if such testimony, along with all reasonable inferences which can be drawn therefrom, could support a verdict for that party, the case should not be taken from the jury.
Comment, M.R.C.P. 50. See Gray v. Edgewater Landing, Inc., 541 So.2d 1044, 1046 *604 (Miss. 1989) (if testimony, along with reasonable inferences can support verdict for nonmoving party, case should be submitted to jury).

ANALYSIS OF LAW
Mississippi follows the fundamental notion that the patient is master of his/her own body. This concept was strongly endorsed in Phillips by and through Phillips v. Hull, 516 So.2d 488 (Miss. 1987).
The foundation for the consent requirement applicable to medical practitioners is the tort law of assault and battery  the legal doctrine protecting the right of each individual to be touched only when and in the way authorized by that individual. A landmark case on consent cites as the `root premise' of consent law the oft-quoted statement of Justice Cardoza that
Every human being of adult years and sound mind has a right to determine what shall be done with his own body, and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable for damages. Canterbury v. Spence, 464 F.2d 772 (D.C. Cir. 1972), quoting Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 105 N.E. 92, 93 (1914).
Medical and surgical procedures that involve touching a patient's person, even the simplest manipulation of a limb, must be properly authorized or the person performing the procedures will be subject to an action for battery. The obvious corollary is that, absent special circumstances, a competent individual has a right to refuse to authorize a procedure, whether the refusal is grounded on doubt that the contemplated procedure will be successful, concern about probable risks or consequences, lack of confidence in the physician recommending the procedure, religious belief, or mere whim.
Phillips by and through Phillips v. Hull, 516 So.2d 488, 491-92 (Miss. 1987) quoting P. Lasky, 11B Hospital Law Manual; Consent to Medical and Surgical Procedures, 1 (1986).
The informed consent rule has been referred to as the "bedrock of this state's respect for the individual's right to be free from unwanted bodily intrusions no matter how well intentioned." In re Brown, 478 So.2d 1033, 1040 (Miss. 1985). In Brown, we noted that the fundamental right to be left alone is rooted in the right to privacy recognized by the common law of this state and Article 3, § 32 of the Mississippi Constitution of 1890. In re Brown, 478 So.2d 1033, 1040 (Miss. 1985), citing Deaton v. Delta Democrat Publishing Company, 326 So.2d 471, 473 (Miss. 1976).
Concisely stated in one sentence, no physician may perform any procedure on a patient no matter how slight or well intentioned without that patient's informed consent, and violation of this rule constitutes a battery:
No physician or hospital may subject one to medical treatment without that person's informed consent. Reikes v. Martin, 471 So.2d 385, 392 (Miss. 1985); Ross v. Hodges, 234 So.2d 905, 908 (Miss. 1970). See Miss. Code Ann. §§ 41-41-3, et seq. (Supp. 1984). Violation of this rule constitutes a battery. See Scott v. Bradford, 606 P.2d 554, 557 (Okla. 1979); Chambers v. Nottebaum, 96 So.2d 716, 718-19 (Fla. App. 1957); Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 14-15 (1905).
In re Brown, 478 So.2d 1033, 1040 (Miss. 1985).
"The positive law of this state affords each person a substantial zone of freedom which, at his election, he may keep private. The zone surrounds person and place and without his consent may not be invaded by other persons... ." Young v. Jackson, 572 So.2d 378, 381 (Miss. 1990). Furthermore, our legislature has recognized the sanctity of the patient's control over one's own body and has enacted several statutes governing consent questions for medical treatment. See Miss. Code Ann. §§ 41-41-3, -5, -7, -9 (Supp. 1991) (who may consent to medical procedures; implied consent under emergency situations; consent by court order, etc.).

*605 APPLICATION OF LAW TO FACTS
The only issue in this case is consent, or not, to remove the IUD. In this regard, this case presented the classic jury question. Who should the jury believe, Mrs. Fox or Dr. Smith? The stories which both parties told at trial cannot be reconciled.
In summary, Mrs. Fox testified that she never gave Dr. Smith permission to remove the IUD. According to Mrs. Fox, the first time that Dr. Smith even mentioned the IUD to her occurred only moments before she was put to sleep in the operating room. Mrs. Fox testified that she shouted, "No, stop," when Dr. Smith asked her if she was ready to have her IUD removed and a D & C. Mrs. Fox maintained that she never saw Dr. Smith until she was wheeled into the operating room.
On the other hand, Dr. Smith testified that he had discussed the IUD with Mrs. Fox during office visits on January 8, 1986, and on February 25, 1986. Dr. Smith maintained that Mrs. Fox's initial position was that she did not want the IUD removed. However, on rounds before surgery, Dr. Smith alleged that he met with Mrs. Fox and she decided to have the IUD removed, if necessary, in the exercise of sound medical judgment. On that morning, she allegedly told Dr. Smith, "use your own judgment." Again, Mrs. Fox categorically denied seeing Dr. Smith in her room before surgery.
Under our scope of review, it appears reasonable that a juror could have believed Mrs. Fox's version of events and rejected Dr. Smith's version. All of the evidence and reasonable inferences are to be considered in the light most favorable to Mrs. Fox. Wells Fargo Armored Service Corp. v. Turner, 543 So.2d 154, 157 (Miss. 1989); Hammond v. Grissom, 470 So.2d 1049 (Miss. 1985); McGaugh v. Gray, 495 So.2d 1024 (Miss. 1986). If Mrs. Fox is to be believed, she specifically forbade Dr. Smith to remove the IUD only moments before surgery. Ergo, if Dr. Smith removed the IUD against her direct prohibition, he committed battery.
Dr. Smith rests his entire argument on one paragraph in the consent form:
I recognize that, during the course of the operation, unforeseen conditions may necessitate additional or different procedures than those set forth above. I, therefore, further authorize and request that the above named surgeon, his assistants or his designees perform such procedures as are, in his professional judgment, necessary and desirable, including but not limited to procedures involving pathology and radiology.
Dr. Smith argues that the above provision authorized him to remove the IUD in the exercise of sound medical judgment. As a means to this end, Dr. Smith cites three cases from other jurisdictions wherein he alleges that a court has held that no battery was committed when a similar provision existed in a hospital consent form. See Davidson v. Shirley, 616 F.2d 224 (5th Cir.1980); Winfrey v. Citizens & Southern National Bank, 149 Ga. App. 488, 254 S.E.2d 725 (1979); Ipock v. Gilmore, 85 N.C. App. 70, 354 S.E.2d 315 (1987).
If we were to accept Dr. Smith's argument, then we must first ignore Mrs. Fox's testimony that she specifically forbade Dr. Smith to remove the IUD. Second, the consent form authorizes necessary and unforeseen procedures "during the course of the operation." It is unclear from this record whether or not an IUD removal is necessary and unforeseen when a laparoscopy is the authorized procedure.

CONCLUSION
Because a material dispute exists on important facts concerning patient consent, the directed verdict for the defendant was error. Therefore, we reverse the judgment of directed verdict granted by the trial court and remand the same to the Lowndes County Circuit Court for a new trial.
REVERSED AND REMANDED.
HAWKINS, P.J., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
*606 ROY NOBLE LEE, C.J., dissents without opinion.
PRATHER, J., not participating.