# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CT-00334-SCT

*LACY DODD AND CHARLES DODD*

*v.*

*DR. RANDALL HINES, MISSISSIPPI*
*REPRODUCTIVE MEDICINE, PLLC AND DR.*
*PAUL SEAGO*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 02/06/2015 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | SARAH LYNN DICKEY |
| | J. KEITH PEARSON |
| ATTORNEYS FOR APPELLEES: | MICHAEL F. MYERS |
| | WHITMAN B. JOHNSON, III |
| | BENJAMIN COLLIER LEWIS |
| | JOHN BURLEY HOWELL, III |
| | WALTER T. JOHNSON |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED.  THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS REVERSED AND REMANDED - 09/14/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.    On March 25, 2011, in an effort to increase chances of conception, Lacy Dodd underwent surgery to remove ovarian cysts and, potentially, one fallopian tube.  During the surgery, Lacy's physician, Dr. Randall Hines, discovered that both of Lacy's ovaries

appeared abnormal to the extent that they seemed cancerous. Dr. Hines consulted, intraoperatively, with his colleague, Dr. Paul Seago. Dr. Seago concluded that both ovaries lacked any appreciable amount of normal tissue and were highly suspicious for malignancy; he recommended that it was in Lacy's best interest to remove both ovaries. Dr. Hines agreed and removed both ovaries. A biopsy later revealed that Lacy's ovaries were not cancerous.

¶2. On May 17, 2013, Lacy and her husband, Charles Dodd, filed a *pro se* complaint against Dr. Hines, Dr. Seago, and Mississippi Reproductive Medicine, PLLC (collectively "the defendants"), claiming that her ovaries were removed without consent.[1] Lacy also alleged that the defendants were negligent in failing to obtain informed consent from the patient and/or her family to proceed with the bilateral salpingo-oophorectomy; failing to wait until a frozen section analysis of the biopsies was available; misdiagnosing Lacy's condition as malignant; removing Lacy's ovaries; and other matters to be proven at trial.

¶3. Prior to discovery, the defendants moved for summary judgment. The trial court entered an order limiting the issue to be argued to consent. The trial court found that Lacy had consented to the removal of her ovaries based on a consent form executed by Lacy prior to the surgery and granted summary judgment in favor of the defendants. Despite the sole issue of consent before the trial court, it entered a final judgment with respect to all of Lacy's claims alleged in her complaint. On appeal, the Court of Appeals determined that Lacy's claim was "battery-based" and held that Lacy did not give express consent for the removal

---

[1] Since the surgery, Lacy has carried and delivered two children through donor eggs and her husband's sperm. Charles Dodd claimed that he sustained loss of consortium, medical expenses, and other expenses incurred in having Lacy bear a child conceived with an egg from another woman, and loss of the ability to have a child with his wife.

of her ovaries and the consent form did not summarily provide consent to remove her ovaries. ***Dodd v. Hines***, No. 2015- CA-00334-COA, 2016 WL 4615034, at \*\*5-6 (¶¶ 24, 27-28) (Miss. Ct. App. Sep. 6, 2016).

¶4. We agree with the result reached by the Court of Appeals. Rather than reaching a definitive conclusion on the issue of consent, we hold that there is a genuine issue of material fact precluding summary judgment as to whether Lacy consented to the removal of her ovaries in accordance with the Court's decisions in ***Cole v. Wiggins***, 487 So. 2d 203 (Miss. 1986), and ***Fox v. Smith***, 594 So. 2d 596 (Miss. 1992). As more fully explained below, we reverse the trial court's judgment and remand for further proceedings for reasons different than those of the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

¶5. In January 2011, Lacy began treatment for fertility issues with Dr. Hines, a physician practicing in the field of obstetrics and gynecology with a subspeciality in infertility medicine. Lacy had a history of ovarian cysts and pelvic pain, as well as a family history of ovarian, uterine, and cervical cancer. Dr. Hines recommended Lacy undergo a laparoscopic procedure to remove her ovarian cysts as a way to resolve her fertility issues and increase her chances of bringing about a viable pregnancy.

¶6. Lacy authorized Dr. Hines to perform a laparoscopy with ovarian cystectomy with possible salpingectomy, i.e., removal of ovarian cysts or cysts and possible removal of one of her fallopian tubes. Lacy executed a consent form prior to the surgery authorizing the procedure. The consent form also provided, in pertinent part:

3

I further consent and authorize the performance of such additional surgeries and procedures (whether or not presently unforseen conditions) considered necessary or emergent in the judgment of my doctor or those of the hospital's medical staff who serve me.

¶7. During the laparosocpy, Dr. Hines discovered that Lacy's ovaries were extremely abnormal to the extent that they appeared cancerous. Considering Lacy's family history of ovarian cancer, Dr. Hines consulted intraoperatively with Dr. Seago, a physician in the field of gynecology and obstetrics with a subspeciality in gynecological oncology. Dr. Seago examined Lacy's ovaries and found that both ovaries lacked any appreciable amount of normal ovarian tissue and were highly suspicious for malignancy. Dr. Seago believed the removal of both ovaries to be necessary for her long term health and in her best interest and recommended removing both ovaries. Dr. Hines agreed and removed both ovaries.

¶8. After Lacy awoke from surgery, she learned that Dr. Hines had removed both of her ovaries. Lacy's caregivers sent both ovaries to a pathology lab, and a pathologist determined that her ovaries were not cancerous; rather, she had suffered from "serous cystadenofibroma," a condition where a benign tumor appears cancerous.

¶9. On May 17, 2013, Lacy and Charles Dodd filed a complaint against Dr. Hines, Dr. Seago, and Reproductive Medicine, alleging that the ovaries were removed without consent and that the defendants were negligent in failing to obtain her informed consent to proceed with the removal of her ovaries, failing to wait until a biopsy could be completed, misdiagnosing her condition, and removing her ovaries. Lacy claimed that as a direct and proximate result of the negligence of the defendants, she sustained the following damages: the complete inability to conceive her own child; mental and emotional distress; physical pain

4

and suffering; medical expenses, other expenses incurred in travel to other medical facilities, implanting an egg from another female and bearing a child of her husband's, but not her biological child; and other matters sought to be proven at trial.

¶10.   Before discovery commenced, Dr. Hines and Reproductive Medicine filed a motion for summary judgment on December 23, 2013.  Dr. Hines and Reproductive Medicine mentioned the consent form in their motion but argued that they were entitled to judgment as a matter of law based on the lack of causation and the statute of limitations.[2]  Dr. Hines's affidavit attached to the motion stated that the likelihood Lacy would ever have had a child from one of her own eggs was practically nonexistent given the near total absence of recognizable ovarian tissue.  Dr. Hines stated that neither ovary had sufficiently normal ovarian tissue to have permitted her ever to bear a child from one of her own eggs.  Dr. Hines and Dr. Seago ruled out a biopsy during the surgery because of their strong belief of the presence of ovarian cancer, and obtaining a biopsy potentially could have spread the presumed cancer throughout the pelvis and abdomen.  Dr. Hines and Dr. Seago both agreed that they believed it was "medically necessary" and in Lacy's "best interests" to remove both ovaries.

¶11.   On February 3, 2014, counsel entered an appearance on Lacy's behalf.  On April 17, 2014, Lacy filed a motion to hold Dr. Hines's and Reproductive Medicine's motion for summary judgment in abeyance pending discovery.  Lacy's counsel explained that Lacy had proceeded *pro se* until she had retained counsel in late January 2014.  Lacy's counsel also

---

[2] The trial court did not reach the causation or statute of limitations arguments in its eventual order granting summary judgment.

explained that the law firm that represented Lacy prior to her filing a complaint had consulted an expert prior to filing suit who believed there was a reasonable basis to initiate a cause of action. Lacy's counsel stated that a determination had not been made whether to use the consulting expert or to retain a new expert or whether the consulting expert would be willing to serve as a testifying expert in the case.

¶12. On April 25, 2014, Dr. Hines and Reproductive Medicine filed a rebuttal memorandum in support of their motion for summary judgment. Dr. Hines and Reproductive Medicine argued that Lacy's failure to submit sworn expert testimony to support her allegations of negligence and causation warranted the entry of summary judgment.

¶13. On May 5, 2014, the trial court entered an agreed order continuing the hearing on the motion for summary judgment as well as Lacy's motion to hold the motion for summary judgment in abeyance. On May 22, 2014, the trial court entered another agreed order continuing the hearings. The order provided that the parties had agreed that the motions "save for the causation part" of Dr. Hines's and Reproductive Medicine's motion for summary judgment would be heard on September 15, 2014. The September 15 hearing did not occur.

¶14. On October 1, 2014, the trial court entered an order holding "[a]ll matters with regard to" Dr. Hines's and Reproductive Medicine's motion for summary judgment "in abeyance except regarding the consent issue." The trial court instructed Dr. Hines and Reproductive Medicine to file either a supplement to their motion or a separate motion for summary judgment "specifically addressing the consent issue, which will then be set for hearing." The

6

trial court ordered Lacy's motion for additional time to respond to Dr. Hines's and Reproductive Medicine's pending motion for summary judgment to be held in abeyance, while reserving that Lacy be allowed to respond to the supplemental motion on the consent issue. The trial court instructed the parties "to obtain a hearing date on the supplemental motion for summary judgment on the consent issue once it is filed."

¶15. On October 16, 2014, Dr. Hines and Reproductive Medicine filed a supplemental motion for summary judgment arguing that Lacy gave her consent for Dr. Hines to perform any surgery or additional procedure that was considered necessary based on the consent form. Alternatively, Dr. Hines and Reproductive Medicine argued that Lacy was unable to meet the requirements of causation. Specifically, Dr. Hines and Reproductive Medicine argued that Lacy "cannot show that a reasonable patient would have withheld consent had she been informed of the risks of not removing the ovaries, which is required for her to make out a claim for informed consent." On October 16, 2014, Dr. Seago filed a joinder in Dr. Hines's and Reproductive Medicine's supplemental motion for summary judgment.[3] On October 30, 2014, Dr. Seago submitted an affidavit stating that he believed the removal of Lacy's ovaries was necessary for her long term health and in her best interest.

¶16. Lacy filed a response to the supplemental motion pointing out that, although the trial court had held all issues relating to causation in abeyance, the defendants had raised new arguments charging Lacy with the task of proving the requirements of causation for informed consent before the parties had engaged in discovery. "Out of an abundance of caution," Lacy

---

[3] Dr. Seago also joined in Dr. Hines's and Reproductive Medicine's pending motion for summary judgment that had been held in abeyance.

7

responded to the defendants' causation arguments.

¶17. On November 20, 2014, Lacy submitted an affidavit asserting that, prior to consenting to the laparoscopic procedure, she never was informed that removal of her ovaries was a known or potential risk. Lacy stated that neither Dr. Hines nor the staff at Reproductive Medicine "mentioned or even hinted that [her] ovaries might be removed during the laparoscopic procedure, either in writing or in [her] pre-surgical consultation with Dr. Hines." Lacy stated that her ovaries were removed without her consent while she was unconscious and under anesthesia. Lacy stated that had she been informed that Dr. Hines and Dr. Seago believed her ovaries were cancerous and had she been given a choice as to whether to allow the removal of her ovaries, she would have elected to wait for the results of the biopsy of her ovarian tissue and requested a second opinion so she could make a fully informed decision. Lacy emphasized that, even if her ovaries had contained cancerous tumors, she would not have authorized removal of her ovaries without exploring any and all methods to preserve her ability to bear her own genetic children.

¶18. On November 21, 2014, Dr. Hines and Dr. Seago submitted additional affidavits. Dr. Hines stated that the consent form did not require him to conclude the surgery and awaken Lacy to obtain specific consent prior to performing the oophorectomy when he and Dr. Seago discovered what appeared to be ovarian cancer. Dr. Seago's affidavit echoed Dr. Hines's affidavit. A notice of hearing indicated that the supplemental motion for summary judgment was heard on November 24, 2014, but no transcript of the hearing is in the record. On February 6, 2015, the trial court entered an order granting summary judgment in favor of the

8

defendants. The pertinent portion of the trial court's detailed order is set out below

demonstrating the exact basis for the trial court's decision:

> [The trial court] finds that there is no genuine issue of material fact and that the defendants are are entitled to judgment as a matter of law on the grounds that the removal of the plaintiff Lacy Dodd's ovaries was consented to and authorized by Mrs. Dodd in the consent form which she signed which specifically granted to the operating physicians the authority to perform "such additional surgeries and procedures (whether or not arising from presently unforeseen conditions) considered necessary or emergent in the judgment of my doctor." Both the operating physician, Dr. Hines, and the assisting physician, Dr. Seago, have stated in Affidavits that the removal of Mrs. Dodd's ovaries was necessary in their judgment and have explained the thought process behind their conclusion. The Affidavits of Dr. Hines and Dr. Seago were accepted by the [trial c]ourt for the purposes of explaining the subjective basis for the exercise of these doctors' judgment and were not submitted by the defendants and not accepted by the [trial c]ourt as expert affidavits. The [trial c]ourt's ruling is not based upon expert opinion, and the [trial c]ourt specifically notes that this Order is not based upon plaintiffs' failure to submit an expert affidavit in response to the [defendants' affidavits.] Rather, the [trial c]ourt finds that the signed consent form at issue specifically included a provision which allowed the doctors to perform any procedure in their judgment necessary that arose during the surgery. There is no genuine issue of material fact that their judgment was that the procedure was necessary. Consequently, the procedure performed by Dr. Hines and assisted by Dr. Seago was consented to and authorized by Mrs. Dodd, such that she can have no complaint arising from the performance of the procedure. Having concluded that defendants are entitled to judgment as a matter of law on this ground, the [trial c]ourt does not reach the other grounds for summary judgment raised in various pleadings by the defendants. The [trial c]ourt finds that the defendants' entitlement to judgment as a matter of law on this ground is dispositive of all claims raised in this matter.

### *The Opinion of the Mississippi Court of Appeals*

¶19. On appeal, the Court of Appeals framed the sole issue before it, "The issue before us

is whether Lacy provided appropriate consent for the removal of her ovaries, eliminating her

ability to conceive." *Dodd*, 2016 WL 4615034, at *2 (¶ 11). The Court of Appeals

9

proceeded by stating, "[t]wo different analyses of consent exist: a consent analysis based on assault and battery, and an informed-consent analysis based on medical negligence." *Id*. at *3 (¶ 12). The Court of Appeals continued: "Mississippi has not directly addressed when it is appropriate to apply the battery-based analysis or the medical-negligence-based analysis." *Id*. at *2 (¶ 12).

¶20.    The Court of Appeals cited an unreported Rhode Island case for the proposition that "there are some instances where applying the medical-negligence-based analysis as opposed to battery-based analysis would be 'illogical.'" *Dodd*, 2016 WL 4615034, at *3 (¶ 16) (citing *Spaight v. Shah-Hosseini*, No. C.A. PC 04-6802 (R.I. Super. Ct. Dec. 30, 2009)). For example, when a procedure is performed that was not considered beforehand, it would make no logical sense to require the plaintiff to prove the doctor had a duty to disclose a material or known risk of an uncontemplated procedure. *Id.* The Court of Appeals looked to a Louisiana case for the proposition that a "battery-based" analysis is appropriate when a procedure completely lacked consent. *Id.* at *4 (¶ 17) (citing *Pizzalotto v. Wilson*, 437 So. 2d 859, 862–64 (La. 1983)). In *Pizzalotto*, the Louisiana court applied the battery-based analysis because the removal of the patient's ovary and other reproductive organs logically could not be considered a risk of the laparoscopic procedure that was disclosed. *Id*.

¶21.    Proceeding under the "battery-based analysis," the Court of Appeals turned to the consent form signed by Lacy and applied *Barner v. Gorman*, 605 So. 2d 805 (Miss. 1992). In applying *Barner*, it held that Lacy's consent form was not conclusive evidence of her consent to remove both ovaries. *Dodd*, 2016 WL 4615034, at *5 (¶ ¶ 22-23). Applying a

New Jersey case, the Court of Appeals determined that the removal of Lacy's ovaries was "substantially different" from the procedure Lacy had authorized. *Id.* at \*5 (¶ 24) (citing *Samoilov v. Raz*, 536 A.2d 275, 280-81 (N.J. Super. Ct. App. Div. 1987)). The Court of Appeals went further and determined that the removal of Lacy's ovaries was not only substantially different from the authorized procedure, but it was "antithetical to the purpose of the surgery." *Dodd*, 2016 WL 4615034, at \*5 (¶ 24). The Court of Appeals concluded: "Clearly, Lacy did not expressly authorize the removal of her ovaries." *Id.* The Court of Appeals ultimately held:

> [W]e find that, under the battery-based analysis of consent, Lacy did not give express consent for the removal of her ovaries and that the consent form signed by Lacy did not summarily provide consent to remove her ovaries. As the circuit court's decision did not reach whether or not the removal of her ovaries became necessary or emergent during the medical procedure that was consented to by Lacy, nor did the judgment address any other analysis of consent pertinent to theories of medical liability, we reverse and remand.

*Id.* at \*6 (¶ 27).

¶22. After the Court of Appeals denied their motions for rehearing, the defendants filed petitions for writ of certiorari. Dr. Seago argues that the Court of Appeals erred by holding Lacy did not consent to removal of her ovaries when she entered the consent agreement and by holding summary judgment was improper on Lacy's medical negligence claim. Dr. Seago argues the Court of Appeals' refusal to enforce the consent agreement is a significant departure from the Court's interpretation and enforcement of written agreements. Dr. Seago also argues that only the Legislature has the power to make public policy, and the Court of Appeals decision violates the separation of powers provision of the Mississippi Constitution.

11

Dr. Seago then proceeds to argue that the "public policy decreed by the [Court of Appeals] is a poor one."

¶23. Dr. Hines and Reproductive Medicine argue that the Court of Appeals interfered with the patient/physician relationship by rewriting the consent form, shifted the burden of proof to the defendants, and hopelessly confused battery claims with informed consent claims. Dr. Hines and Reproductive Medicine also argue that the Court of Appeals decision will have a profound impact on the practice of medicine, to the detriment of the patient.

## STANDARD OF REVIEW

¶24. "When evaluating a trial court's grant or denial of summary judgment, this Court applies a de novo standard of review." *City of Tupelo v. Patterson*, 208 So. 3d 556, 561 (¶ 15) (Miss. 2017). Summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. (56)(c). "The evidence must be viewed in the light most favorable to the party against whom the motion has been made, and the moving party bears the burden of demonstrating that no genuine issue of fact exists." *Young v. Meacham*, 999 So. 2d 368, 371 (¶ 13) (Miss. 2008). "[I]f there is doubt as to whether or not a fact issue exists, it should be resolved in favor of the non-moving party." *Id*.

## DISCUSSION

**Whether the trial court erred by granting summary judgment based solely on the executed consent form.**

¶25. Most importantly, the only issue before the trial court and Court of Appeals was

12

whether Lacy consented to the removal of her ovaries. At the present juncture, any analysis as to causation or elements of Lacy's claims that require expert testimony is premature and not properly before the Court. No discovery has occurred, and the trial court specifically had held all other issues, including issues as to causation, in abeyance. Moreover, the trial court had refused to accept any expert testimony and expressly stated in its order that it did not accept Dr. Hines's and Dr. Seago's affidavits as expert affidavits. Based on the record before the Court, it is unnecessary to look to other jurisdictions for guidance.

¶26.    The case of *Fox v. Smith*, 594 So. 2d 596 (Miss. 1992), is factually similar to the case *sub judice*. Lana Fox filed a complaint against Dr. Perrin Smith, alleging that Dr. Smith had committed a battery to her person by the unauthorized removal of her intrauterine device (IUD). *Id.* at 596. Fox sought treatment from Dr. Smith for severe low abdominal pain. *Id.* at 597. Dr. Smith recommended laparoscopic surgery to determine a diagnosis. *Id*. According to Dr. Smith, the two discussed possible removal of her IUD as part of the surgery. *Id.* at 601. Conversely, Fox testified that they did not discuss removing the IUD during pre-op appointments and that she insisted immediately prior to the surgery that he not remove the device. *Id*. at 599. During surgery, Dr. Smith discovered that Fox's IUD had broken into several pieces. *Id*. at 602. Dr. Smith testified that the fragmented device would present various health risks to Fox and that he removed the device in good medical judgment. *Id*. at 602-03. The trial court granted a directed verdict in favor of the physician. *Id*. at 597.

¶27.    Even though the *Fox* Court stated that Fox had brought a battery claim against Dr. Smith, the Court discussed the informed consent doctrine recognized in Mississippi. The

Court explained "Mississippi follows the fundamental notion that the patient is master of his/her own body." ***Fox v. Smith***, 594 So. 2d 596, 604 (Miss. 1992). "The foundation for the consent requirement applicable to medical practitioners is the tort law of assault and battery--the legal doctrine protecting the right of each individual to be touched only when and in the way authorized by that individual." ***Id***. "Every human being of adult years and sound mind has a right to determine what shall be done with his own body, and a surgeon who performs an operation without his patient's consent commits an assault for which he is liable for damages." ***Id***. The Court continued:

> Medical and surgical procedures that involve touching a patient's person, even the simplest manipulation of a limb, must be properly authorized or the person performing the procedures will be subject to an action for battery. The obvious corollary is that, absent special circumstances, a competent individual has a right to refuse to authorize a procedure, whether the refusal is grounded on doubt that the contemplated procedure will be successful, concern about probable risks or consequences, lack of confidence in the physician recommending the procedure, religious belief, or mere whim.
>
> . . .
>
> The informed consent rule has been referred to as the "bedrock of this state's respect for the individual's right to be free from unwanted bodily intrusions no matter how well intentioned." ***In re Brown***, 478 So. 2d 1033, 1040 (Miss. 1985). In ***Brown***, we noted that the fundamental right to be left alone is rooted in the right to privacy recognized by the common law of this state and Article 3, § 32 of the Mississippi Constitution of 1890. ***In re Brown***, 478 So. 2d 1033, 1040 (Miss. 1985), citing ***Deaton v. Delta Democrat Publishing Company***, 326 So. 2d 471, 473 (Miss. 1976).

***Fox***, 594 So. 2d at 604.

¶28.    After explaining the origin of the informed consent rule, the ***Fox*** Court stated the general rule: "Concisely stated in one sentence, no physician may perform any procedure on

a patient no matter how slight or well intentioned without that patient's informed consent, and violation of this rule constitutes a battery[.]" *Id*.

¶29.   The *Fox* Court then squarely framed the sole issue before it: "The only issue in this case is consent, or not, to remove the IUD.  In this regard, this case presented the classic jury question. Who should the jury believe, Mrs. Fox or Dr. Smith? The stories which both parties told at trial cannot be reconciled."  *Id*. at 605.

¶30.   Dr. Smith rested his entire argument on one paragraph in the consent form signed by Fox, purportedly authorizing him to remove the IUD in the exercise of sound medical judgment:

> I recognize that, during the course of the operation, unforeseen conditions may necessitate additional or different procedures than those set forth above.  I, therefore, further authorize and request that the above named surgeon, his assistants or his designees perform such procedures as are, in his professional judgment, necessary and desirable, including but not limited to procedures involving pathology and radiology.

*Fox*, 594 So. 2d at 605.

¶31.   Dr. Smith urged the Court to follow cases from other jurisdictions for the proposition that no battery was committed when a similar provision existed in a hospital consent form, but the Court rejected Dr. Smith's argument.  *Id*.  The Court reversed the judgment of directed verdict for two reasons: (1) it refused to ignore Fox's testimony that she specifically forbade the doctor from removing her IUD; and (2) it was unclear if removal of the device was a necessary and unforeseen procedure when the patient consented to a laparoscopy.  *Id*. at 605-06.

¶32.   Like *Fox*, the sole issue before the Court is whether Lacy consented, or not, to the

15

removal of both ovaries. *Fox* is instructive in determining whether the consent form signed by Lacy is a basis for summary judgment. In *Fox*, the Court rejected the physician's argument that a patient consented to a different procedure by signing a consent form containing virtually the identical language as the form in the present case. *Id.* at 606. Moreover, as in *Fox*, it is unclear that the removal of her ovaries was necessary or emergent when she consented to a laparoscopy, cystectomy, and the possible removal of one fallopian tube. Notably, the consent form was not dispositive even though it simply required that the additional or different procedures be considered necessary and desirable based on the subjective belief of the treating physician.

¶33. The case *sub judice* is distinguishable from *Fox* in that Lacy does not assert she expressly told Dr. Hines not to remove her ovaries prior to surgery. Fox testified that she expressly forbade the physician from performing the procedure. *Id*. at 599. However, as the Court of Appeals reasoned, the result of the surgery – removal of Lacy's ovaries – was "antithetical" to the purpose of the surgery – to determine the cause of Lacy's infertility. *Dodd*, 2016 WL 4615034, at \*5 (¶ 24). The antithetical nature of Lacy's surgery is comparable to the express forbiddance present in *Fox*.

¶34. The Court's decision in the likewise factually similar *Cole v. Wiggins*, 487 So. 2d 203 (Miss. 1986), ultimately controls the case *sub judice* because it dealt with a similarly developed record on appeal. James A. Cole suffered a severe injury to his left index finger at work. *Id*. at 204. Cole was taken to the hospital, where he was treated by orthopedic surgeon Dr. Christopher E. Wiggins. *Id*. Cole signed two authorization forms and was taken

16

into surgery in which his entire left index finger was amputated. *Id*. Cole filed a complaint against Dr. Wiggins, alleging that the actions taken by Dr. Wiggins in amputating his entire finger constituted medical malpractice. *Id*. Cole asserted two theories of liability: "(1) he was never informed that his entire finger might be amputated and (2) that he never gave his informed consent thereto." *Id.*

¶35.    Cole claimed "that Dr. Wiggins informed him that if the partially severed portion of his finger could not be salvaged, the finger would be amputated at the middle joint." *Id.* "Conversely, Dr. Wiggins contend[ed] Mr. Cole was completely informed of the possible results of the surgery[,]" and "it was impossible to salvage the severed portion of the finger and, in order to avoid future pain and complication, it was necessary to amputate the entire finger." *Id.* The trial court entered a protective order preventing Cole from deposing or cross examining Dr. Wiggins because Cole had not retained an expert witness to substantiate his claims. *Id*. at 205. The trial court granted summary judgment in favor of Dr. Wiggins prior to Cole retaining an expert witness. *Id.* at 204.

¶36.    On appeal, the Court took issue with the trial court's entry of a protective order to prevent Dr. Wiggins from being annoyed. *Id*. at 205-06. The Court stated that, "[o]verlooked in that ruling was the fact that [Cole] was also alleging Dr. Wiggins never received [Cole's] informed consent to amputate his entire finger." *Id.* at 205. The Court acknowledged that "[a] physician is under a duty under some circumstances to warn his patient of the known risks of proposed treatment or surgery, so that the patient will be in a position to make an intelligent decision as to whether he will submit to such treatment or

17

surgery." *Id*. Moreover, "[m]atters which are within the common knowledge of laymen are exceptions to the rule that expert medical testimony is required." *Id*. The Court held that "[n]o expert testimony was required to establish what communication transpired between Mr. Cole and Dr. Wiggins." *Id.* at 206.

¶37. In addressing the trial court's grant of summary judgment in favor of Dr. Wiggins, the Court again emphasized that "expert medical testimony is needed to establish negligence in a malpractice action[;] [h]owever, no expert testimony is needed to prove what communications transpired between the doctor and the patient. *Id*. at 206. The Court continued:

> The absence of an expert witness to testify that Dr. Wiggins was negligent clearly led to the summary judgment on the negligence question. But what about the question of informed consent? In his affidavit, Dr. Wiggins stated he fully informed the plaintiff of the procedures to be performed and that the plaintiff fully understood them. In contrast, the plaintiff stated in his affidavit that amputation of the entire left index finger was never mentioned to him and that he never consented thereto. Mississippi case law holds, "Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says just the opposite." Those facts are exactly what is presented in the instant case.

*Id*. at 207 (internal citations omitted).

¶38. The Court also noted: "Additionally, the plaintiff alleges he did not give an informed consent, although the record shows his signature." *Id*. Notwithstanding the signed consent form, the Court held that the trial court erred by granting summary judgment because Dr. Wiggins swore to one version of the matter and Cole swore to just the opposite. *Id*. As a result, the Court reversed and remanded for further proceedings. *Id*.

18

¶39. As in *Fox*, the signed consent form was not dispositive in *Cole*. Moreover, Cole brought separate theories of liability, i.e, that he was never informed his entire finger might be amputated and that he never gave his informed consent thereto. *Cole*, 487 So. 2d at 204. The Court also said that Cole had stated two issues in his complaint: (1) whether the doctor received the informed consent of the patient for the entire procedure performed and (2) whether the doctor was negligent in performing the procedures.

¶40. Like Cole, Lacy brought separate theories of liability. According to Lacy's complaint, she alleged that she never gave consent for the removal of her ovaries and that Dr. Hines removed both of her ovaries without her consent. Additionally, Lacy alleged that the defendants were negligent in the following ways: failing to obtain her informed consent; failing to wait until a frozen section analysis of biopsies was available; misdiagnosing her condition; and removing her ovaries.

¶41. Pursuant to the Court's decisions in *Fox* and *Cole*, we reverse and remand for further proceedings as to Lacy's lack of informed consent claim because a genuine issue of material fact prevents summary judgment on the issue. Moreover, as in *Cole*, any analysis relating to the defendants' alleged negligence is premature because the trial court entered an order limiting the issue before it to consent and did not accept expert testimony.

¶42. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS REVERSED AND REMANDED**.

**RANDOLPH, P.J., KITCHENS, KING, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. DICKINSON, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION. WALLER, C.J., NOT PARTICIPATING.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶43.    The circuit judge granted summary judgment for one reason: he found that Lacy gave informed consent for the removal of her ovaries. The majority reverses, finding that a material issue of fact exists as to whether Lacy gave that consent. I disagree.

¶44.    The facts which gave rise to a triable issue of fact on consent in *Fox v. Smith*—the authority upon which the majority primarily relies—are not present here. That case concerned a patient who claimed her doctor removed her IUD without consent.[4] There, the patient testified she expressly told her doctor not to remove the IUD.[5] And, while that patient signed a form consenting to other necessary medical procedures similar to the one at issue here, she also testified that she questioned a nurse about that provision and was told it only consented to life-saving measures employed in response to an emergency during the surgery.[6]

¶45.    Lacy has put forth no similar evidence. She does not dispute that she signed the consent form authorizing "such additional surgeries and procedures (whether or not presently unforseen conditions) considered necessary or emergent in the judgment of my doctor or those of the hospital's medical staff who serve me." She does not contend anyone misled her as to the meaning of this provision. And she does not contend she forbade the removal of her ovaries.

¶46.    Rather, Lacy argues only that she did not give informed consent because no one told

---

[4] *Fox v. Smith*, 594 So. 2d 596 (Miss. 1992).

[5] *Id.* at 605.

[6] *Id.* at 600.

20

her that her ovaries might be removed. But the consent's plain, unambiguous terms included procedures based on "unforseen conditions." So I do not agree a material issue of fact exists as to whether Lacy consented to procedures—like the removal of her ovaries—deemed necessary by her physicians.

¶47. That said, I agree we must reverse the grant of summary judgment. Lacy's claim is not simply lack of consent. Instead, she alleges medical malpractice in her physicians' judgment that it was necessary to remove her ovaries. While Lacy consented to the performance of procedures deemed necessary by her physicians, she did not waive her claim the physicians negligently concluded the procedure was necessary.